## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

Consumer Financial Protection Bureau,

     Plaintiff,

     v.

Rocket Homes Real Estate LLC,

JMG Holding Partners LLC, dba The Jason Mitchell Group, Jason Mitchell Real Estate Alabama LLC, Jason Mitchell Real Estate Arizona LLC, Jason Mitchell Real Estate California, Inc., Jason Mitchell Real Estate California LLC, Jason Mitchell Real Estate Colorado LLC, Jason Mitchell Real Estate Connecticut LLP, Jason Mitchell Real Estate Delaware LLC, Jason Mitchell Real Estate Florida LLC, Jason Mitchell Real Estate Georgia LLC, Jason Mitchell Real Estate Hawaii LLC, Jason Mitchell Real Estate Idaho LLC, Jason Mitchell Real Estate Illinois LLC, Jason Mitchell Real Estate Indiana LLC, Island Experts Realty LLC (Hawaii), Jason Mitchell Real Estate Kansas LLC, Jason Mitchell Real Estate Kentucky LLC, Jason Mitchell Real Estate Louisiana LLC, Jason Mitchell Real Estate Maryland LLC, Jason Mitchell Real Estate Massachusetts LLC, Jason Mitchell Real Estate Manhattan LLC, Jason Mitchell Real Estate Group Michigan LLC, Jason Mitchell Real Estate Minnesota LLC, Jason Mitchell Real Estate Mississippi LLC, Jason Mitchell Real Estate Missouri

Case Number: 2:24-cv-13442

LLC, Jason Mitchell Real Estate Nevada LLC, Jason Mitchell Real Estate New Hampshire LLC, Jason Mitchell Real Estate New Jersey LLC, Jason Mitchell Real Estate New Mexico LLC, Jason Mitchell Real Estate New York LLC, Jason Mitchell Real Estate North Carolina LLC, Jason Mitchell Real Estate Ohio LLC, Jason Mitchell Real Estate Oklahoma LLC, Jason Mitchell Real Estate Oregon, LLC, Jason Mitchell Real Estate Pennsylvania LLC, Jason Mitchell Real Estate Rhode Island LLC, Jason Mitchell Real Estate South Carolina LLC, Jason Mitchell Real Estate South Dakota LLC, Jason Mitchell Real Estate Tennessee LLC, Jason Mitchell Real Estate Texas LLC, Jason Mitchell Real Estate Utah LLC, Jason Mitchell Real Estate Virginia LLC, Jason Mitchell Real Estate Washington LLC, Jason Mitchell Real Estate Washington DC LLC, Jason Mitchell Real Estate Wisconsin LLC, Jason Mitchell Real Estate Wyoming LLC,

and

Jason C. Mitchell (an individual),

Defendants

## Complaint

The Consumer Financial Protection Bureau (Bureau) brings this action against Rocket Homes Real Estate LLC (Rocket Homes), JMG Holding Partners LLC dba The Jason Mitchell Group and its above-

captioned state LLC real estate brokerage affiliates (collectively, the

Mitchell Group), and Jason Mitchell, and alleges the following.

## Introduction

1.      Buying a home can be one of the largest and most consequential

decisions in many consumers' lives. As part of that process, consumers

often rely on the advice of their real estate agent. Real estate agents should

make referrals and recommendations to their clients based on their

professional judgment and in sole consideration of their clients' best

interests.

2.      But when real estate agents accept things of value in exchange

for referring their clients to a provider of other services, it corrupts the real

estate agents' relationship with their clients and taints their advice.

Congress therefore enacted the Real Estate Settlement Procedures Act

(RESPA) to, among other things, prohibit real estate agents from accepting

things of value in exchange for referring their clients to particular

settlement service providers, including mortgage lenders and providers of title, escrow, and closing services.[1]

3.    Rocket Homes operates a large referral network, which matches consumers interested in buying a home with a real estate brokerage working in the local area of the consumer's home buying search. The brokerages who receive referrals from Rocket Homes are independent companies from Rocket Homes. If the consumer ends up buying a home with the real estate brokerage to which the consumer was referred by Rocket Homes, the brokerage pays a referral fee. Rocket Homes' referral fee is typically calculated as 35% of the brokerage's commission.

4.    Rocket Homes tells consumers that a buyer's agent "represents the buyer and their interests during the home buying process."[2] But Rocket Homes requires the real estate agents and brokers who receive its referrals to steer consumers to its affiliate company, Rocket Mortgage, LLC (Rocket

---

[1] 12 U.S.C. § 2607(a) ("Prohibition Against kickbacks and unearned fees. (a) Business Referrals. No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.").

[2] Carla Ayers, *What is a Buyer's Agent and What Do They Do?*, April 29, 2024 *available at* https://www.rockethomes.com/blog/home-buying/reasons-why-you-need-a-buyers-agent (visited Dec. 6, 2024).

Mortgage), and away from potential competitors, and to refrain from mentioning the value of comparison shopping for mortgage loans or discussing various programs or options not offered by Rocket Mortgage.

5.     This "preserve and protect" requirement that Rocket Homes pushed on real estate agents undermined the duties the agents owed to their clients. For example, some agents receiving Rocket Homes referrals were reluctant to mention certain options to their clients—including first-time homebuyer down payment assistance programs, USDA loans, and loans on manufactured housing—because Rocket Mortgage didn't offer those options. And some real estate agents actively steered their clients away from comparison shopping Rocket Mortgage with other lenders.

6.     Rocket Mortgage charged higher rates and fees to consumers who went through the Rocket Homes network compared with consumers who didn't go through the network.

7.     Rocket Homes also used its referral pipeline to pressure real estate brokers and agents to refer their home-grown clients—who had no previous relationship or expressed interest in a Rocket company—to use Rocket Mortgage to finance their homes. And Rocket Homes similarly used its referral pipeline to leverage referrals from real estate brokers and agents

to Amrock, LLC (Amrock), another Rocket Companies, Inc. subsidiary, for title, escrow, and closing services.

8. Rocket Homes, in turn, gave priority for future referrals from its referral network to those real estate brokers and agents who made their own referrals to Rocket Mortgage and Amrock.

9. The Mitchell Group and Jason Mitchell were Rocket Homes' enthusiastic partners in the Rocket Mortgage and Amrock kickback scheme. The Mitchell Group's real estate agents made thousands of referrals to Rocket Mortgage and Amrock in return for priority for referrals from Rocket Homes. Jason Mitchell, on multiple occasions, requested additional referrals from Rocket Homes for specific real estate brokers. Rocket Homes met his requests for additional referrals. Rocket Homes also selected the Mitchell Group for several pilot programs, which resulted in additional referrals that weren't available to other real estate brokerages.

10. The ability to receive future referrals from the Rocket Homes network and being given priority for additional referrals of potential home buyers made through Rocket Homes' referral network are "things of value" under RESPA. Specifically, RESPA's implementing regulation, Regulation X, defines a "thing of value" to include "the opportunity to participate in a

money-making program."[3] Real estate brokerages competed fiercely with one another to receive referrals from the Rocket Homes network, which shows that they considered the referrals to be things of value.

11.    The Bureau therefore brings this action under RESPA Section 8, 12 U.S.C. § 2607, and its implementing regulation, Regulation X, 12 C.F.R. part 1024; and section 1054(a) of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. § 5564(a), to address violations of law in connection with the conduct of Rocket Homes, the Mitchell Group, and Jason Mitchell in the provision of real estate settlement services.

## Jurisdiction and Venue

12.    This Court has subject-matter jurisdiction over this action because the action is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 28 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345.

13.    Venue is proper in this District because Defendants are located, reside, or do business in this district. 12 U.S.C. § 5564(f).

## Parties

14.    The Bureau is an independent agency of the United States that regulates the offering and providing of consumer financial products and

---

[3] 12 C.F.R. § 1024.14(d).

services under "Federal consumer financial laws," 12 U.S.C. § 5491(a),

which include RESPA and the CFPA, 12 U.S.C. §§ 5481(12)(M) and (14).

The Bureau has independent litigating authority to enforce "Federal

consumer financial laws," 12 U.S.C. § 5564(a)-(b), including RESPA, 12

U.S.C. § 2607(d)(4), and the CFPA, 12 U.S.C. § 5481(14).

15.    Rocket Homes is incorporated in Michigan, is a subsidiary of

Rocket Companies, Inc. (Rocket Companies), and is licensed as a real estate

brokerage by the State of Michigan. Rocket Companies is a publicly traded

company (NYSE symbol RKT). Rocket Homes' main office and principal

place of business is located at 701 Griswold St., Suite 21, Detroit, MI 48226.

Rocket Homes operates a referral network that matches consumers with

real estate brokerages throughout the United States.

16.    Real estate brokerage services are a "settlement service" as

defined by RESPA.[4] Rocket Homes is therefore a person under Section 8 of

RESPA. 12 U.S.C. §§ 2602(5), 2607.

17.    Rocket Mortgage is a "creditor" as that term is defined by 15

U.S.C. § 1602(g), and which is then incorporated by reference into RESPA,

---

[4] 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service
provided in connection with a real estate settlement, including, but not
limited to, the following: . . . services rendered by a real estate agent or
broker . . .").

12 U.S.C. § 2602(1)(B)(iv). Rocket Mortgage, which was previously known as Quicken Loans, makes or invests in residential real estate loans aggregating more than $1,000,000 per year. *See* 12 U.S.C. § 2602(1)(B)(iv).

18.     The vast majority of mortgages originated by Rocket Mortgage from June 3, 2020, to the date of this complaint were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. § 1024.2(b).

19.     The home loans originated by Rocket Mortgage constitute "business incident to or a part of a real estate settlement service" within the meaning of RESPA Section 8. 12 U.S.C. §§ 2602(3), 2607(a); *see also* 12 C.F.R. § 1024.2(b) (defining "settlement service").

20.     The title, escrow, and closing services offered by Amrock also constitute "business incident to or a part of a real estate settlement service" within the meaning of RESPA Section 8. 12 U.S.C. §§ 2602(3), 2607(a); *see also* 12 C.F.R. § 1024.2(b) (defining "settlement service").

21.     Defendant JMG Holding Partners LLC is an Arizona Corporation and is the parent company of the above-captioned state LLC real estate brokerages. JMG Holding Partners LLC's primary address is 3080 N. Civic Center Plaza, Suite 100, Scottsdale, AZ 85251. JMG Holding

Partners is a person under RESPA, 12 U.S.C. § 2602(5), which includes

"individuals, corporations, associations, partnerships, and trusts."

22.    JMG Holding Partners LLC's state subsidiary LLCs hold the

individual state licenses and roll up financially into the holding company.

The state LLC brokerages include: Jason Mitchell Real Estate Alabama

LLC, Jason Mitchell Real Estate Arizona LLC, Jason Mitchell Real Estate

California, Inc., Jason Mitchell Real Estate Real Estate California LLC,

Jason Mitchell Real Estate Colorado LLC, Jason Mitchell Real Estate

Connecticut LLP, Jason Mitchell Real Estate Delaware LLC, Jason Mitchell

Real Estate Florida LLC, Jason Mitchell Real Estate Georgia LLC, Jason

Mitchell Real Estate Hawaii LLC, Jason Mitchell Real Estate Idaho LLC,

Jason Mitchell Real Estate Illinois LLC, Jason Mitchell Real Estate Indiana

LLC, Island Experts Realty LLC (Hawaii), Jason Mitchell Real Estate

Kansas LLC, Jason Mitchell Real Estate Kentucky LLC, Jason Mitchell Real

Estate Louisiana LLC, Jason Mitchell Real Estate Maryland LLC, Jason

Mitchell Real Estate Massachusetts LLC, Jason Mitchell Real Estate

Manhattan LLC, Jason Mitchell Real Estate Group Michigan LLC, Jason

Mitchell Real Estate Minnesota LLC, Jason Mitchell Real Estate Mississippi

LLC, Jason Mitchell Real Estate Missouri LLC, Jason Mitchell Real Estate

Nevada LLC, Jason Mitchell Real Estate New Hampshire LLC, Jason

Mitchell Real Estate New Jersey LLC, Jason Mitchell Real Estate New Mexico LLC, Jason Mitchell Real Estate New York LLC, Jason Mitchell Real Estate North Carolina LLC, Jason Mitchell Real Estate Ohio LLC, Jason Mitchell Real Estate Oklahoma LLC, Jason Mitchell Real Estate Oregon, LLC, Jason Mitchell Real Estate Pennsylvania LLC, Jason Mitchell Real Estate Rhode Island LLC, Jason Mitchell Real Estate South Carolina LLC, Jason Mitchell Real Estate South Dakota LLC, Jason Mitchell Real Estate Tennessee LLC, Jason Mitchell Real Estate Texas LLC, Jason Mitchell Utah LLC, Jason Mitchell Real Estate Virginia LLC, Jason Mitchell Real Estate Washington LLC, Jason Mitchell Washington DC LLC, Jason Mitchell Real Estate Wisconsin LLC, and Jason Mitchell Real Estate Wyoming LLC.

23. Real estate brokerage services are a "settlement service" as defined by RESPA.[5] Each state LLC listed in ¶ 22 is a person under Section 8 of RESPA. 12 U.S.C. §§ 2602(5), 2607.

24. JMG Holding Partners LLC, through its subsidiary Jason Mitchell Real Estate Michigan LLC, is licensed to do business in this district and does substantial business in this district. Specifically, JMG Holding

---

[5] 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connection with a real estate settlement, including, but not limited to, the following: . . . services rendered by a real estate agent or broker . . .").

Partners is the sole owner of Jason Mitchell Real Estate Michigan LLC, which does substantial business in this district and is located at 100 Maple St. Suite 112, Wyandotte, MI 48192. The Mitchell Group's Michigan website currently lists 13 licensed real estate agents.

(https://www.mitchellgroupmi.com/about) <last visited Dec. 20, 2024>.

25.    Jason Mitchell is a licensed real estate salesperson in Arizona and is the Mitchell Group's CEO. Mitchell trained the real estate agents who worked in the Michigan office, accepted things of value from Rocket Homes on the Michigan office's behalf, and gave things of value to Rocket Mortgage and Rocket Homes through his Michigan real estate brokers' and agents' referrals to Rocket Mortgage and Amrock. Mitchell would make periodic business trips to Rocket Homes' office in Detroit, Michigan, and meet in person in Michigan with Rocket Homes managers and executives.

26.    Jason Mitchell owns 58% of JMG Holding Partners LLC. And, among other things, Mitchell helped train the Mitchell Group's brokers and agents, and he routinely met and communicated with Rocket Homes and Rocket Companies managers and executives. Mitchell is a person under Section 8 of RESPA. 12 U.S.C. §§ 2602(5), 2607.

## Industry background and
## the Real Estate Settlement Procedures Act

27.   Buying a house is one of the most significant financial transactions in a typical consumer's life. Many consumers rely on real estate agents to guide them through this process.

28.   Real estate agents are professionals who have passed all required real estate classes and meet the relevant state licensing requirements. Real estate brokers may work individually or arrange to have agents work under them.

29.   Real estate brokers and agents often make recommendations to their clients for various settlement services, such as mortgage lending or title insurance. To help prevent the exploitation of consumers' reliance on their brokers or agents, RESPA Section 8(a) prohibits giving things of value to anyone, including brokers and agents, in return for referring consumers to particular real estate settlement service providers. 12 U.S.C. § 2607(a). RESPA Section 8(a) also prohibits any person from accepting any thing of value in return for referring consumers to a particular real estate settlement service provider. 12 U.S.C. § 2607(a).

30.   RESPA's implementing regulation, Regulation X, explains that an agreement or understanding to make referrals in return for things of value "need not be written or verbalized but may be established by a

practice, pattern or course of conduct." 12 C.F.R. § 1024.14(e). Moreover, "when a thing of value is received repeatedly and is connected in any way with the volume or value of business referred, the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

31.    Regulation X also provides that a "thing of value" is "broadly defined" and "includes, without limitation, monies, things, discounts, salaries, fees [and] . . . the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

## Rocket Homes' referral network

32.    Rocket Homes operates a referral network that matches consumers who are interested in buying a home with a real estate brokerage licensed in the state where the consumer is searching for homes.

33.    Many of Rocket Homes' consumers that are fed into the referral network come from Rocket Mortgage. Some are consumers who sought a preapproval letter from Rocket Mortgage to assist with their home buying search and accepted the company's offer to help them find a local real estate agent through Rocket Homes.

34.    Rocket Homes would then match the consumer with a real estate brokerage. Sometimes Rocket Homes would also recommend that a

specific real estate agent be assigned to the consumer; other times the real estate brokerage would choose the agent.

35.    If the consumer bought a home using the agent who received the referral, the real estate brokerage would pay a referral fee, typically calculated as 35% of the agent's overall commission, to Rocket Homes.

36.    For example, if a real estate agent represented a Rocket-Homes-referred consumer purchasing a $300,000 house, and the agent charged a commission of 3%, the agent's overall commission would be $9,000 ($300,000 * .03) for the transaction. The real estate brokerage would then pay $3,150 ($9,000 * .35) to Rocket Homes as the referral fee, while splitting the remaining $5,850 between the brokerage and the agent.

37.    Rocket Homes' referral fee had no relationship to any services Rocket Homes itself performed related to the consumer. And it was labeled a "referral fee" in the contract sending the referral to the real estate brokerage: "In consideration of the referral of [client name], Broker has agreed to pay Rocket Homes Real Estate 35% of the gross commissions (including any bonuses) received by the Broker on the client side of any real estate transaction involving [client name]."

38.    Beginning on or around 2019, many consumers entered the referral network through channels other than Rocket Mortgage, including

leads from RocketHomes.com, others from the ForSaleByOwner.com website (owned by Rocket Homes), and some through leads that Rocket Homes bought from third parties. The consumers who entered the referral network through these other channels didn't have a preexisting connection to Rocket Mortgage.

39.    While many consumers close their mortgage with the lender who provided their preapproval letter, a significant proportion go elsewhere for their final mortgage business. Hence, just because a consumer obtained a preapproval letter from Rocket Mortgage doesn't mean that the consumer had selected Rocket Mortgage or wasn't potentially interested in exploring other lending options. And many Rocket Homes-referred consumers who came from other channels—such as purchased leads—had no connection with Rocket Mortgage and in no way had selected Rocket Mortgage as their chosen lender.

**Rocket Homes conditioned the right to receive future referrals— a thing of value under RESPA—on real estate brokers' and agents' agreement to refer their clients to Rocket Mortgage**

40.    Real estate brokers and agents must agree to Rocket Homes' terms and conditions before they can receive referrals from Rocket Homes. One of Rocket Homes' terms and conditions required real estate brokers

and agents to steer their clients into using Rocket Mortgage to finance their home.

41.    The 2019 version of Rocket Homes' terms and conditions includes a section called "Preserve and protect the Referral Source Relationship." The section told real estate brokers that, "As a Broker in our Network, it is important to preserve and protect the relationship between the client and their chosen lender, Quicken Loans [aka Rocket Mortgage]." The section also provided that "The Broker agrees that he/she and his/her Partner Agents will educate themselves and the client on the benefits of using Quicken Loans and other Rock Family of Companies services." Finally, the section included a warning that "Purposefully steering a client from Quicken Loans to another mortgage lender is prohibited and could result in termination of the Broker's relationship with Rocket Homes."

42.    The 2019 Rocket Homes terms and conditions also explain that "Partner Agent performance is a critical factor in assigning clients. Rocket Homes measures Partner Agent success within the client's desired search area by monitoring the following Key Performance Indicators: . . . 2. Quicken Loans conversion . . . 4. Quicken Loans Mortgage Banker satisfaction rating."

43.     Rocket Homes compiled statistics to measure individual real estate brokerages' and agents' Quicken Loans conversion rates. Rocket Homes used these statistics to allocate referrals to the brokers and agents who were more successful at steering their clients to Rocket Mortgage.

44.     Rocket Homes was very focused on ensuring that real estate agents didn't refer consumers to competing lenders because the Rocket Companies made significantly more money on the mortgage origination and servicing fees paid to Rocket Mortgage than from the referral fee paid to Rocket Homes.

45.     The Quicken Loans Mortgage Banker (also known as a loan officer) satisfaction rating, another Rocket Homes performance indicator, also depended heavily on the agent's ability to steer the consumer to Rocket Mortgage. One of the main reasons why a Rocket Mortgage banker would express dissatisfaction with an agent was when the mortgage banker felt that the agent didn't do enough to steer the consumer to Rocket Mortgage.

46.     While Rocket Homes revised subsequent editions of the terms and conditions, it continued to run the referral network in a manner that required real estate agents steer their clients away from potential mortgage competitors to Rocket Mortgage. For example, the January 1, 2022 version of the Rocket Homes terms and conditions still included "Rocket Mortgage

banker satisfaction rating (when applicable)" as one of five key
performance indicators. It also required agents to warn Rocket Mortgage
"when clients are considering other lending sources" and directed agents to
"establish a relationship with the Rocket Mortgage banker assigned to the
client." And, most importantly, the January 1, 2022 terms and conditions
still included the preserve and protect requirement and warned that a
failure to follow the requirement "could result in termination of the
broker's relationship with Rocket Homes."

47.    Rocket Homes finally removed the preserve and protect
requirement with its March 1, 2024 version of the terms and conditions.
Instead, it included a requirement that real estate agents "respect[] the
client's choice of lender."

48.    But many consumers had not "chosen" Rocket Mortgage as
their lender at the time of the referral. A substantial percentage of the
clients referred by Rocket Homes to an agent had no relationship with any
lender at all. And even those consumers who had some preexisting
relationship with Rocket Mortgage, such as those who had a preapproval
letter, could still benefit from comparison shopping Rocket Mortgage with
other lenders, and might still be interested in learning about potential

benefits from their real estate agents, such as down payment assistance programs, even if Rocket Mortgage didn't offer those benefits.

49.     Rocket Homes also frequently reminded real estate agents and brokers of their obligation to steer consumers to Rocket Mortgage. When assigning each individual referral, Rocket Homes sent the agent or broker a "client profile and referral agreement." This document warned that: "Rocket Mortgage is the client's chosen lender. Any purposeful steering away from Rocket Mortgage is prohibited. Also, Rocket Mortgage does not lend on manufactured homes or co-ops."

50.     Rocket Homes included a cover sheet with the Client Profile and Referral Agreement, which included instructions to steer the consumer to Rocket Mortgage, even for some consumers who hadn't yet been preapproved by Rocket Mortgage.

51.     Rocket Homes threatened, suspended, and sometimes removed real estate agents that didn't adequately steer their clients away from other mortgage lenders.

52.     This included reprimanding a real estate agent whose client complained about Rocket Mortgage's rates and fees seeming high, and the agent then suggesting the client get a second opinion from a local lender.

Rocket Homes reprimanded another agent for telling their client that other lenders work with people who have lower credit scores.

53.     Rocket Homes also punished real estate agents who helped their clients obtain down payment assistance if Rocket Mortgage didn't participate in those programs. For example, Rocket Homes punished a real estate agent for setting their client up with a local lender, who obtained $15,000 in down payment assistance from the Tennessee Housing Development Agency (THDA). Rocket Mortgage didn't participate in the THDA program at the time.

54.     An estimated 50% of all the penalties Rocket Homes assessed on real estate agents were for the agents' violations of the preserve and protect requirement.

55.     Rocket Homes also repeatedly pressured real estate brokerages to hit a capture rate of 80%. This meant that, of the Rocket Homes consumers who were referred to a real estate brokerage and ended up buying a home, Rocket Homes wanted at least 80% of those consumers to get their mortgage from Rocket Mortgage.

56.     Rocket Homes made numerous calls to real estate brokerages where it emphasized the need for the brokerage to meet the 80% figure.

57.   Rocket Homes also made real estate brokerages explain what steps they were taking to deal with agents who weren't hitting their capture-rate goals.

58.   The real estate agents got the message. Many reported censoring themselves in response to their client's questions about other lenders or loan programs and instead repeatedly talking up Rocket Mortgage. Some even disparaged Rocket Mortgage's rival lenders.

59.   The Mitchell Group used assertive tactics when implementing the Rocket Homes preserve and protect requirement, including steering clients referred by Rocket Homes away from potential mortgage competitors to Rocket Mortgage. Mitchell taught his agents to create "a fear" in their clients that they could lose the home they were trying to buy—and possibly their earnest money—if they considered any lender other than Rocket Mortgage.

60.   Rocket Homes also pushed real estate brokerages to refer their home-grown clients to Rocket Mortgage. These were consumers who didn't come through the Rocket Homes referral network and didn't have any prior connection to Rocket Mortgage. Rocket Homes made site visits to various real estate brokerages, along with representatives from Rocket Mortgage and Amrock.

61.     The message from these site visits, whether explicit or implied, was that to continue getting Rocket Homes referrals, the real estate agents needed to step up their efforts to refer their home-grown clients to Rocket Mortgage and Amrock.

62.     Rocket Homes would sometimes call real estate brokerages and directly challenge them to make a referral to Rocket Mortgage.

63.     Rocket Homes' efforts at driving referrals from the real estate brokers and agents in its network resulted in more than 10,000 additional referrals sent to Rocket Mortgage during 2019 compared with the previous year.

64.     Rocket Homes steered additional referrals—a thing of value under RESPA—to real estate brokerages who referred their home-grown clients to Rocket Mortgage and cut referral flow for those who didn't.

65.     Rocket Homes gave financial incentives to the Rocket Homes agent coordinators, who allocated referrals between real estate brokerages, to encourage them to steer referral flow to those brokerages who made home-grown referrals to Rocket Mortgage.

66.     Rocket Homes also encouraged real estate brokers and agents to make referrals to Amrock. For example, in a Rocket Homes mandatory

training, Rocket Homes told the real estate agents and brokers that "Amrock is the Preferred Provider to Rocket Homes and Rocket Mortgage."

67.     The January 1, 2022 version of the terms and conditions explained that "Rocket Homes encourages our Verified Partner Agents to utilize Amrock, LLC for all Rocket Homes clients." Rocket Homes also provided a reminder worksheet for the "Key Points" from a mandatory 2021 training. The third "Key Point" was "**Setting Clients Up for Title with Amrock**. –Why Amrock is the preferred title company of Rocket Homes and Rocket Mortgage; --The 4 easy steps to set your client up for title."

68.     Rocket Homes also pushed for Amrock referrals during "roadshows" to real estate brokerages. Amrock would take a turn presenting to an audience that was desperately competing for Rocket Homes referrals with the other real estate brokerages in their geographic area. And again, Amrock repeated the message that they were the "Preferred title and settlement provider to QL and Rocket Homes."

### The Mitchell Group made thousands of so-called Dog Bone referrals to Rocket Mortgage and Amrock in return for prioritized referral flow and participation in pilot programs

69.     The Mitchell Group made thousands of referrals, which it called "Dog Bones," to a list of preferred partners, including Rocket Mortgage and Amrock. In return, the Mitchell Group received priority for referral flow

and was selected by Rocket Homes to participate in several pilot programs, which also resulted in additional referrals.

70.    Jason Mitchell gave $250 gift cards to the top-5 Mitchell Group agents making the most Dog Bone referrals each month. The Mitchell Group also sent up an automatic "Dog Bone Alert" email that notified the Mitchell Group's front office whenever one of their agents made a referral to Amrock or Rocket Mortgage. Mitchell would sometimes forward the Dog Bone Alert emails to Rocket Homes to ensure they knew his agents were funneling business to Rocket Homes' sibling companies.

71.    In return, Jason Mitchell expected priority for referral flow from Rocket Homes. On several occasions, Jason Mitchell explicitly tied the Mitchell Group's requests for additional referral flow to the brokerage giving Amrock and Rocket Mortgage Dog Bone referrals. For example, in an email dated May 16, 2019, with the subject line "my overall plan" Mitchell explains to Rocket Homes that "What's great about the model I have established in our business is that I get the luxury of controlling and directing our agents to use the relationships I say we do. Which is why I am on a mission for Amrock and the exchange of business back to QL [reciprocal referrals]."

72.   In return, Rocket Homes gave Jason Mitchell and the Mitchell Group priority for referral flow. For example, in March 2020, Mitchell asked Rocket Homes for additional referrals for his offices in Orlando, Tampa, and Jacksonville, FL. The Rocket Homes manager in charge of the referral network told her network coordinators to give the Mitchell Group referrals that otherwise would have been headed to other real estate brokers.

73.   In another instance in March of 2021, Jason Mitchell asked for some referrals for his Raleigh, NC brokerage. The following Monday, March 15, 2021, Rocket Homes sent five referrals to the Mitchell Group's Raleigh office.

74.   The Mitchell Group continued to receive referrals from Rocket Homes, continued to steer consumers away from potential mortgage competition to Rocket Mortgage, and continued making Dog Bone referrals to Amrock and Rocket Mortgage through at least March 2022.

75.   The Mitchell Group was also selected by Rocket Homes and other Rocket Companies' entities to participate in several experimental pilot programs. These pilot programs gave additional referral flow that wasn't available to the vast majority of real estate brokerages in the Rocket Homes network, who weren't selected to participate.

**Consumers who were steered to Rocket Mortgage were
deprived of valuable information and
paid higher rates and fees for their mortgages**

76.     The real estate brokers and agents who received referrals from
Rocket Homes couldn't tell their clients about various loan programs and
options without violating Rocket Homes' terms and conditions.

77.     For example, Rocket Homes didn't lend on manufactured
housing until on or about October 2022. Many real estate agents who
received referrals from Rocket Homes during that period would therefore
be reluctant to consider manufactured housing as an option, even for their
clients that might otherwise be well-suited for those homes.

78.     Approximately 70% of Rocket Homes consumers are first-time
homebuyers. And many state and local governments offer down payment
assistance or other benefits to first-time homebuyers. But until August
2022, Rocket Mortgage had a blanket policy of not participating in any of
those programs. The real estate agents therefore couldn't mention the
possibility of using these first-time homebuyer programs to their clients
during that period without violating the Rocket Homes preserve and
protect requirement.

79.     Many of the down payment and first-time homebuyer
assistance programs provide substantial benefits to homebuyers. For

example, the THDA program referenced above gives homebuyers the option of receiving $6,000 in down payment assistance, as an interest-free, forgivable second mortgage.[6] The THDA's down payment assistance program includes a second option that provides a homebuyer with up to $15,000 in down payment assistance at the same interest rate as the homebuyer's first mortgage.[7]

80.   More generally, consumers frequently benefit from comparison shopping for mortgage lenders. But the Rocket Homes terms and conditions made real estate agents less likely to recommend and consumers less likely to look at other lending options and ensure they were getting the best deal possible.

81.   Consumers who went through the Rocket Homes network and obtained a mortgage from Rocket Mortgage paid higher rates and fees than consumers who didn't go through the referral network, and who therefore weren't subjected to the Rocket Homes steering requirements.

---

[6] Tennessee Housing Development Agency, UP TO $15,000 Down Payment Assistance Available, available at https://thda.org/homebuyers/down-payment-assistance.
[7] *Id.*

**COUNT I**
**Rocket Homes violated RESPA Section 8(a) by giving things of value to real estate brokers and agents, pursuant to an agreement or understanding, for mortgage referrals and title and escrow referrals**

82.     The Bureau incorporates paragraphs 1-81 by reference.

83.     RESPA Section 8(a), 12, U.S.C. § 2607(a), provides that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

84.     A "thing of value" is "broadly defined" under Regulation X, and includes, among other things, "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

85.     The real estate brokerages who received referrals from Rocket Homes competed fiercely for referral flow and considered Rocket Homes' referrals a thing of value. Rocket Homes referrals are a thing of value under RESPA.

86.     Regulation X defines a "referral" to include "any oral or written action directed to a person which has the effect of affirmatively influencing the selection of any person of a provider of a settlement service." 12 C.F.R. §

1024.14(f)(1). And "an agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a pattern, practice or course of conduct." 12 C.F.R. § 1024.14(e).

87. The mortgage lending services provided by Rocket Mortgage for federally related loans were "settlement services" under RESPA. 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service in connection with a real estate settlement including, but not limited to, the following: . . . the origination of a federally related mortgage loan."); 12 C.F.R. § 1024.2(b) ("Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) . . . (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan.").

88. The title, escrow, and closing services provided by Amrock are also settlement services under RESPA. 12 U.S.C. § 2602(3) (the term 'Settlement services' includes any service in connection with a real estate settlement including, but not limited to, the following: . . . title searches,

title examinations, the provision of title certificates, title insurance . . . and closing or settlement."); 12 C.F.R. § 1024.2(b) ("Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: . . . (4) Provision of title services, including title searches, title examinations, abstract presentation, insurability determinations, and the issuance of title commitments and title insurance policies. . .(9) Conducting of settlement by a settlement agent and any related services.").

89.    The real estate brokers and agents who received referrals from Rocket Homes made the following referrals to Rocket Mortgage and Amrock, in return: 1) they affirmatively influenced the Rocket Homes' referred clients to use Rocket Mortgage for financing their home purchase by implementing the preserve and protect requirement; 2) they affirmatively influenced their own clients to use Rocket Mortgage; and 3) they affirmatively influenced both their own clients and Rocket Homes referred clients to Amrock for title, closing, and escrow services.

90.    Rocket Homes therefore gave a thing of value to real estate brokers and agents—namely the ability to continue receiving referrals and obtaining priority for future referrals—under an agreement or understanding that the real estate brokers and agents would refer real

31

estate settlement business involving federally related mortgage loans, in violation of RESPA Section 8(a), 12, U.S.C. § 2607(a).

## COUNT II
### Jason Mitchell and the Mitchell Group violated RESPA Section 8(a) by accepting and giving things of value for mortgage referrals and title and escrow referrals

91.    The Bureau re-alleges and incorporates by reference paragraphs 1-90.

92.    Jason Mitchell and the Mitchell Group are persons who accepted things of value from Rocket Homes—namely the ability to continue receiving referrals and priority for future referral flow—under an agreement or understanding that the Mitchell Group would make referrals of real estate settlement services to Rocket Mortgage and Amrock. Jason Mitchell and the Mitchell Group gave things of value, namely $250 gift cards, to the real estate agents in return for their referrals to Rocket Mortgage and Amrock. Accepting and giving of each of these types of things of value violates RESPA Section 8(a), 12 U.S.C. § 2607(a).

93.    Jason Mitchell used his control over his agents to have them discourage their clients from comparison shopping Rocket Mortgage with other mortgage companies, and to have his agents make additional referrals to Rocket Mortgage and Amrock.

94.    Jason Mitchell and the Mitchell Group gave things of value to their real estate salespersons under an agreement or understanding that the real estate salespersons who received the things of value would make referrals to Rocket Mortgage and Amrock, in violation of RESPA Section 8(a), 12 U.S.C. § 2607(a).

## The Court's Power to Grant Relief

95.    Under the CFPA, this Court may grant any appropriate legal or equitable relief with respect to violations of Federal consumer financial law, including, without limitation, a permanent or temporary injunction, recission or reformation of contracts, the refund of moneys paid, restitution, disgorgement or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. § 5565(a).

96.    Under RESPA, this Court may impose injunctive relief to prevent future violations. 12 U.S.C. § 2607(d)(4).

## Requested Relief

97.    The Bureau requests that the Court:

    a. permanently enjoin Defendants from committing future violations of Section 8 of RESPA, 12 U.S.C. § 2607;

    b. award restitution, damages, or other monetary relief against Defendants;

    c. award prejudgment interest;

    d. order Defendants to pay redress to consumers;

e.  order disgorgement of ill-gotten revenues by Defendants;

f.  order Defendants to pay the Bureau's costs incurred in connection with prosecuting this action; and

g.  award additional relief as the Court may determine to be just and proper.

Dated: _____

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Alusheyi J. Wheeler
*Deputy Enforcement Director*
Kara K. Miller
*Assistant Litigation Deputy*

_____

David Dudley
DC Bar No. 474120
email: david.dudley@cfpb.gov
phone: 202-435-9284
fax: 202-435-7722

Colleen Fewer
California Bar No. 323808
email colleen.fewer@cfpb.gov
phone: 202-435-5291
fax: 202-435-7722
Enforcement Attorneys

Consumer Financial Protection
Bureau
1700 G Street NW
Washington, DC 20552


Local Designee
(as required by E.D. Mich. L.R.
83.20(g))

DAWN N. ISON
United States Attorney

KEVIN R. ERSKINE (P69120)
Assistant U.S. Attorney
United States Attorney's Office
211 W. Fort St., Suite 2001
Detroit, MI 48226
Tel: (313) 226-9610
Email: Kevin.Erskine@usdoj.gov