## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Consumer Financial Protection Bureau,   )
                                        )
                                        )
         Plaintiff,                     )   Case No. 2:24-cv-13442
                                        )
    v.                                  )   Hon. Brandy R. McMillion
                                        )
Rocket Homes Real Estate LLC, et al.    )
                                        )
         Defendants.                    )

## THE MITCHELL GROUP'S MOTION TO DISMISS
## PURSUANT TO RULES 12(B)(1) and 12(B)(6)

The Mitchell Group,[1] through counsel and under Federal Rules of Civil Pro-

cedure 12(b)(1) and 12(b)(6), hereby moves to dismiss the Complaint filed by Plain-

tiff the Consumer Financial Protection Bureau. In support of its Motion, the Mitchell

---

[1]  The "Mitchell Group" includes Defendant JMG Holding Partners LLC; its defendant subsid-
iaries, which include Jason Mitchell Real Estate Alabama LLC, Jason Mitchell Real Estate
Arizona LLC, Jason Mitchell Real Estate California, Inc., Jason Mitchell Real Estate Califor-
nia LLC, Jason Mitchell Real Estate Colorado LLC, Jason Mitchell Real Estate Connecticut
LLP, Jason Mitchell Real Estate Delaware LLC, Jason Mitchell Real Estate Florida LLC,
Jason Mitchell Real Estate Georgia LLC, Jason Mitchell Real Estate Hawaii LLC, Jason
Mitchell Real Estate Idaho LLC, Jason Mitchell Real Estate Illinois LLC, Jason Mitchell Real
Estate Indiana LLC, Island Experts Realty LLC (Hawaii), Jason Mitchell Real Estate Kansas
LLC, Jason Mitchell Real Estate Kentucky LLC, Jason Mitchell Real Estate Louisiana LLC,
Jason Mitchell Real Estate Maryland LLC, Jason Mitchell Real Estate Massachusetts LLC,
Jason Mitchell Real Estate Manhattan LLC, Jason Mitchell Real Estate Group Michigan LLC,
Jason Mitchell Real Estate Minnesota LLC, Jason Mitchell Real Estate Mississippi LLC, Ja-
son Mitchell Real Estate Missouri LLC, Jason Mitchell Real Estate Nevada LLC, Jason
Mitchell Real Estate New Hampshire LLC, Jason Mitchell Real Estate New Jersey LLC, Jason
Mitchell Real Estate New Mexico LLC, Jason Mitchell Real Estate New York LLC, Jason
Mitchell Real Estate North Carolina LLC, Jason Mitchell Real Estate Ohio LLC, Jason Mitch-
ell Real Estate Oklahoma LLC, Jason Mitchell Real Estate Oregon, LLC, Jason Mitchell Real
Estate Pennsylvania LLC, Jason Mitchell Real Estate Rhode Island LLC, Jason Mitchell Real
Estate South Carolina LLC, Jason Mitchell Real Estate South Dakota LLC, Jason Mitchell

Group relies upon the Brief in Support attached hereto. On February 17 and again on February 20, counsel for the Mitchell Group sought via email to initiate a telephone conference with counsel for the Bureau to discuss whether the Bureau concurs in the relief sought. The Bureau did not engage in that discussion.

I certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length under Local Rule 7.1(d)(3).

---

Real Estate Tennessee LLC, Jason Mitchell Real Estate Texas LLC, Jason Mitchell Real Estate Utah LLC, Jason Mitchell Real Estate Virginia LLC, Jason Mitchell Real Estate Washington LLC, Jason Mitchell Real Estate Washington DC LLC, Jason Mitchell Real Estate Wisconsin LLC, Jason Mitchell Real Estate Wyoming LLC; and defendant Jason C. Mitchell, as an individual.

Respectfully submitted,

Date: February 21, 2025

/s/ *Thomas F. Burke*
Thomas F. Burke
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
P: 215.665.8500
F: 215.864.8999
BurkeT@ballardspahr.com

Aaron Schaer
**BALLARD SPAHR LLP**
13313 Balfour Ave.
Huntington Woods, MI 48070
Telephone:   (206) 223-7103
Facsimile:    (206) 223-7107
SchaerA@ballardspahr.com

*Counsel for the Mitchell Group*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Consumer Financial Protection Bureau, | ) |
| | ) |
| Plaintiff, | ) Case No. 2:24-cv-13442 |
| | ) |
| v. | ) Hon. Brandy R. McMillion |
| | ) |
| Rocket Homes Real Estate LLC, et al. | ) |
| | ) |
| Defendants. | ) |

## BRIEF IN SUPPORT OF THE MITCHELL GROUP'S
## MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)

Date: February 21, 2025

Thomas F. Burke
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
P: 215.665.8500
F: 215.864.8999
BurkeT@ballardspahr.com

Aaron Schaer
**BALLARD SPAHR LLP**
13313 Balfour Ave.
Huntington Woods, MI 48070
Telephone:  (206) 223-7103
Facsimile:   (206) 223-7107
SchaerA@ballardspahr.com

*Counsel for the Mitchell Group*

# **TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED ............................................................. vi

STATEMENT OF CONTROLLING/MOST APPROPRIATE
    AUTHORITY ....................................................................................... vii

**I.**    INTRODUCTION .................................................................... 1

**II.**    FACTUAL BACKGROUND ................................................... 4

    A.    The Mitchell Group ..................................................... 4
    B.    The Bureau's Claims Against the Mitchell Group ................ 6

**III.**    APPLICABLE LEGAL STANDARD ...................................... 7

**IV.**    ARGUMENT ............................................................................ 7

    A.    The Complaint fails to state a claim under RESPA § 2607(a). ........... 7

        1.    The Mitchell Group's alleged conduct is encompassed by the Section 8(c)(3) "safe harbor" for cooperative brokerage arrangements. .............................................. 9

        2.    The Mitchell Group's alleged conduct is encompassed by the Section 8(c)(2) "safe harbor" for services actually performed. ............................................................... 11

        3.    "Referral flow" is not a "thing of value" under Section 8....... 15

        4.    The Bureau cannot state a claim based on 12 C.F.R. § 1024.14(d). ....................................................... 17

    B.    The Complaint engages in impermissible shotgun pleading. ............ 20

    C.    The Complaint should be dismissed to the extent it is predicated on conduct that predates the three-year statute of limitations........... 22

    D.    This Court lacks federal question jurisdiction because the CFPB is unlawfully funded. ......................................................... 24

**V.**    **CONCLUSION** ........................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................7

*Carter v. Welles-Bowen Realty, Inc.*,
   736 F.3d 722 (6th Cir. 2013) ...........................................................18

*Cedeno v. IndyMac Bancorp, Inc.*,
   No. 06 Civ. 6438 (JGK), 2008 WL 3992304 (S.D.N.Y. Aug. 26,
   2008) ................................................................................................14

*CFPB v. Borders & Borders, PLC*,
   No. 3:13-CV-01047-CRS, 2018 WL 1440606 (W.D. Ky. Mar. 22,
   2018) ...........................................................................13, 15, 16, 17, 18

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
   601 U.S. 416 (2024)..........................................................................23

*Dobronski v. Tobias & Assocs., Inc.*,
   No. 23-10331, 2024 WL 1174553 (E.D. Mich. Mar. 18, 2024).........20

*Durr v. Intercounty Title Co. of Ill.*,
   14 F.3d 1183 (7th Cir. 1994) .............................................................7

*Egerer v. Woodland Realty, Inc.*,
   556 F.3d 415 (6th Cir. 2009) .......................................................8, 21

*Fedorova v. Foley*,
   No. 1:22-cv-991, 2023 WL 4064542 (W.D. Mich. May 30, 2023) ...20

*Freeman v. Quicken Loans, Inc.*,
   566 U.S. 624 (2012)..........................................................................14

*Gen. Elec. Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995)..........................................................19

*Glover v. Standard Federal Bank*,
   283 F.3d 953 (8th Cir. 2002) ...........................................................12

*GMAC Mortg., LLC v. McKeever*,
   No. 08-459-JBC, 2010 WL 3470312 (E.D. Ky. Aug. 31, 2010) ....................... 21

*Gomez v. Wells Fargo Bank, N.A.*,
   676 F.3d 655 (8th Cir. 2012) ....................................................................... 16, 17

*Hadley v. Chrysler Grp. LLC*,
   No. 13-13665, 2014 WL 988962 (E.D. Mich. Mar. 13, 2014) ......................... 24

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) .......................................................................................... 19

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024) ................................................................................. 17

*Moctezuma-Reyes v. Garland*,
   124 F.4th 416 (6th Cir. 2024) ...................................................................... 17

*NLRB v. Bell Aerospace Co.*,
   416 U.S. 267 (1974) ...................................................................................... 19

*PHH Corp. v. CFPB*,
   839 F.3d 1 (D.C. Cir. 2016) ................................................................... 9, 13, 19

*Procopio v. Guaranteed Rate, Inc.*,
   No. 10-13284, 2011 WL 1627326 (E.D. Mich. Apr. 29, 2011) ................... 21, 23

*Rembisz v. Lew*,
   590 F. App'x 501 (6th Cir. 2014) ................................................................. 22

*Taylor v. Gorilla Capital, Inc.*,
   No. 6:18-cv-648-MC, 2018 WL 3186946 (D. Or. June 28, 2018) .............. 16, 17

*Tiger Lily, LLC v. United States HUD*,
   992 F.3d 518 (6th Cir. 2021) ....................................................................... 15

**Federal Statutes**

12 U.S.C. § 289 ................................................................................................ 24

12 U.S.C. § 2601 .......................................................................................... 8, 20

12 U.S.C. § 2602 ............................................................................................. 15

12 U.S.C. § 2607 ..................................................................................*passim*

12 U.S.C. § 2614 .............................................................................21

12 U.S.C. § 2617 .............................................................................18

12 U.S.C. § 5497 .............................................................................24

Dodd-Frank Act ..............................................................................24

Pub. L. 94-205 ................................................................................10

**Rules**

Federal Rule of Civil Procedure 8 ..............................................20

**Regulations**

12 C.F.R. § 1024.14 .......................................................................17

**Other Authorities**

Federal Reserve Balance Sheet Developments, December 2024 ............................24

Senate Report No. 93-866 (1974), *reprinted in* 1974 U.S. C.C.A.N.
    6545.........................................................................................12

v

## STATEMENT OF ISSUES PRESENTED

1.  Whether the Bureau has alleged a violation of RESPA Section 8(a) against the Mitchell Group for acting pursuant to cooperative broker arrangements, which are a protected "safe harbor" under RESPA Section 8(c)(3)?

    Answer: NO.

2.  Whether the Bureau has alleged a violation of RESPA Section 8(a) against the Mitchell Group for receiving a "thing of value" in exchange for services the Mitchell Group actually performed, which is a protected "safe harbor" under RESPA Section 8(c)(2)?

    Answer: NO.

3.  Whether the Bureau has alleged the Mitchell Group violated RESPA Section 8(a) by receiving intangible referral flow, as opposed to a "thing of value"?

    Answer: NO.

4.  Whether the Bureau can allege that the Mitchell Group violated RESPA Section 8(a) by expanding the definition of "thing of value" beyond that term's statutory definition?

    Answer: NO.

5.  Whether the Bureau has alleged that each of the 47 entities and individual encompassing the Mitchell Group violated RESPA Section 8(a) where the Bureau's allegations lump all components of the Mitchell Group together?

    Answer: No.

6.  Whether the Bureau can allege that the Mitchell Group violated RESPA Section 8(a) based on conduct alleged to have occurred over three years before the filing of the Complaint?

    Answer: NO.

7.  Whether this Court has subject matter jurisdiction over the Complaint when the Bureau is pursuing this action using unlawful funding?

    Answer: NO.

**STATEMENT OF CONTROLLING/MOST APPROPRIATE AUTHORITY**

The controlling authority for this Motion includes:

1. Federal Rule of Civil Procedure 12(b)(1)

2. Federal Rule of Civil Procedure 12(b)(6)

3. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

4. Real Estate Settlement Procedures Act, 12 U.S.C. § 2607

5. Regulation X, 12 C.F.R. § 1024.14

6. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024)

7. *Moctezuma-Reyes v. Garland*, 124 F.4th 416 (6th Cir. 2024)

## I.    __INTRODUCTION__

Section 8 of the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2607(a), has always been understood to prohibit kickbacks—payments of cash or similar consideration—in exchange for the referral of settlement services (mortgage loans, title insurance, and so forth), based on Congress's determination that such payments can increase the cost of home ownership for consumers. Now, however—after 50 years of RESPA on the books—the Consumer Financial Protection Bureau has concocted a novel legal theory under which it contends that the flow of consumer referrals between real estate brokerages can *also* constitute an actionable kickback under RESPA. But that claim runs headlong into an express statutory exemption, 12 U.S.C. § 2607(c)(3), which states that Section 8 does *not* prohibit real estate brokerages from referring consumers to other brokerages—full stop. Because the Bureau's theory of liability is based entirely on such referrals, that exemption is the beginning and end of this case.

More specifically, the Bureau's core allegation is that defendant brokerage Rocket Homes Real Estate LLC referred consumer leads to defendant brokerage the Mitchell Group[2] in exchange for the Mitchell Group's recommendation that its third-party agents refer customers back to Rocket Homes affiliates for mortgages and title

---

[2]    "The Mitchell Group" includes defendant JMG Holding Partners LLC, its majority owner defendant Jason C. Mitchell, and the 45 state-based corporate subsidiary defendants listed in footnote 1 of the Motion accompanying this brief.

insurance. If this case is litigated into discovery, the record will show that *all* such referrals were made based on *quality*—the knowledge that trusted partners would provide exemplary service and lead to better results for homebuyers. But this case should never reach that stage, because even taking the Complaint at face value, the Bureau's egregiously inventive legal theory cannot be squared with long-settled law.

*First*, Section 8 contains several express "safe harbor" provisions that exempt certain kinds of payments from its ambit. Two apply here. The Section 8(c)(3) exemption for "cooperative brokerage" agreements *allows* brokerages and agents to send referrals to one another, even in exchange for a fee. That exemption covers Rocket Homes' referrals to the Mitchell Group, as well as a series of *de minimis* payments allegedly made by the Mitchell Group to its agents. Further, the Section 8(c)(2) exemption provides that payments for "services actually rendered" cannot give rise to Section 8 liability. Here, Rocket Homes sent referrals to the Mitchell Group that have no value except where a consumer ultimately chooses the Mitchell Group, closes a transaction, and pays a commission. The Bureau does not contest that such payments were for brokerage services actually rendered by the Mitchell Group—meaning that those payments *and* the preceding referrals are exempt.

*Second*, Section 8 liability exists only where a defendant, in connection with the referral of settlement services, gives or receives a "thing of value," which is defined by statute as *payment* or similar consideration. The concept is simple: when a

2

mortgage lender pays cash for a referral, that cost may get padded into the resulting mortgage, making the deal more expensive for the consumer. The Bureau now contends that an intangible such as "referral flow" can be a "thing of value"—but problematically for the Bureau, neither the statute nor its enabling rule, Regulation X, say anything of the sort. Without a "thing of value," the Bureau's case collapses, and the Complaint must be dismissed.

*Third*, the Complaint suffers from other serious defects warranting dismissal. The Bureau engages in flagrant and impermissible group pleading against the Mitchell Group's constituent members, leaving them without actual notice of the claims against each defendant; it facially relies on conduct that predates the statute of limitations; and it has been filed only through the Bureau's unlawful use of funds drawn from the Treasury without statutory authorization.

The Bureau filed this action in the waning days after the election of the current presidential administration but before its Director had been dismissed. The Complaint is a last-ditch effort by the outgoing Director to advance an untenable legal theory. It is unsurprising, then, that the Bureau has failed even to participate in a meet-and-confer regarding this motion. But regardless of the Bureau's unclear position on the potential dismissal of its own Complaint, this Court has no shortage of good reasons to dismiss the case on the merits, and it should do so at this time.

3

## II.   **FACTUAL BACKGROUND**[3]

### A.   **The Mitchell Group**

The Complaint alleges virtually nothing about the structure and operations of the Mitchell Group. But it does explain, in generalized terms, that real estate *brokerages* work with third-party real estate *agents* as independent contractors, who in turn assist prospective homebuyers in the course of finding a home and closing the transaction. (Compl. ¶¶ 27–28.) For clarity, defendant JMG Holding Partners LLC, doing business as the Jason Mitchell Group, is a limited liability company formed and headquartered in Arizona that does not, in its own right, broker any real estate transactions or contract with any real estate agents. The 45 other corporate defendants (the Mitchell Brokerages) are subsidiaries of JMG Holding Partners LLC that were formed in various states for purposes of providing real estate brokerage services pursuant to appropriate licenses. (*Id.* ¶¶ 22–24.) Jason Mitchell is the majority owner of JMG Holding Partners LLC, and a licensed real estate agent. (*Id.* ¶¶ 25–26.)

The Mitchell Brokerages develop business in various ways. Some homebuyer clients are "home grown," i.e., identified and developed by the brokerages or their agents. (*See id.* ¶¶ 7, 60–64 (referring to "home-grown" clients.) Other clients come to the Mitchell Brokerages by referral, which is not only lawful but commonplace.

---

[3]   The Mitchell Group accepts well-pleaded facts as true for purposes of this motion only.

(*Id.* ¶¶ 71–72.) Rocket Homes, in particular, is one of many sources of referrals to the Mitchell Brokerages. (*Id.*)

Rocket Homes operates a referral network that matches homebuyers with real estate brokerages in the appropriate locality. (*Id.* ¶ 32.) Some of those individuals reach Rocket Homes through its lending affiliate, Rocket Mortgage, and have already been preapproved for a mortgage, while others come to Rocket Homes through other channels. (*Id.* ¶¶ 33, 38.) Rocket Homes generates revenue by receiving referral fees—again, a lawful and commonplace practice—from brokerages in the event that a transaction closes. (*Id.* ¶¶ 35–37.) The fee is a fixed percentage of the commission received by the brokerage. (*Id.* ¶ 37.) Consequently, just as real estate brokerages have a financial incentive to affiliate with high-quality agents who will provide efficient, reliable services to homebuyers in the course of finding and closing on a home (and thus earn commissions), Rocket Homes, too, has a strong financial incentive to refer homebuyers to brokerages with a track record of success.

During the course of closing a real estate transaction, a homebuyer has the absolute right to select their preferred provider for each of several "settlement services," including mortgage lending, as well as title, escrow, and closing services. The brokerage's involvement in that process is attenuated. The brokerage can lawfully suggest to its agents that they consider recommending the brokerage's preferred partners for those services. But the agents are independent contractors, not

employees, and they are free to accept or reject the brokerage's suggestion. And in the event that the agent does make a recommendation, the homebuyer is free to accept or reject it.

Consistent with that framework, the Mitchell Group maintained a market-dependent list of "preferred partners" that it recommended its agents suggest to homebuyers in connection with settlement services. (Compl. ¶ 69.) Affiliates of Rocket Homes, including Rocket Mortgage and Amrock, were on the list of preferred partners. (*Id.*) The Mitchell Group tracked those referrals using the term "Dog Bones," and gave *de minimis* $250 gift cards on a monthly basis to agents who made the most referrals to preferred partners. (*Id.* ¶¶ 69–70.)

### B.   The Bureau's Claims Against the Mitchell Group

The Bureau alleges that the Mitchell Group, in exchange for asking its agents to steer business to Rocket Mortgage and Amrock, expected Rocket Homes to send it more referrals. (*Id.* ¶¶ 71–75.) The Complaint cites a single May 2019 email exchange in which Mitchell discusses his nominal ability to direct agents to recommend Amrock. (*Id.* ¶ 71.) The Complaint also cites two instances, from March 2020 and March 2021, respectively, in which Jason Mitchell allegedly asked for, and received, additional referrals from Rocket Homes. (*Id.* ¶¶ 72–73.)

The Bureau alleges that the Mitchell Group received referrals from Rocket Homes while also steering customers to Rocket Mortgage and Amrock through "at least" March 2022. (*Id.* ¶ 74.) It does not, however, allege the date on which federal

mortgage loans associated with those referrals actually closed (or even *whether* such closings occurred). And last, the Bureau contends that Rocket Homes selected the Mitchell Group to participate in unspecified "experimental pilot programs" that somehow led to "additional referral flow" to the Mitchell Group. (*Id.* ¶ 75.)

## III.   APPLICABLE LEGAL STANDARD

"To survive a motion to dismiss, a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Id.* at 678. Although the court must accept as true all well-pleaded allegations and related reasonable inferences, allegations that are "no more than conclusions" are "not entitled to the assumption of truth." *Id.* at 679.

## IV.   ARGUMENT

### A.   The Complaint fails to state a claim under RESPA § 2607(a).

"At its core, RESPA is an anti-kickback statute." *Durr v. Intercounty Title Co. of Ill.*, 14 F.3d 1183, 1186 (7th Cir. 1994) (quotation marks and citation omitted). "Its purpose is to prohibit all kickback and referral fee arrangements whereby any payment is made or thing of value furnished for the referral of real estate settlement business." *Id.* (citations and internal punctuation omitted). In enacting RESPA, Congress was focused on prohibiting kickbacks that, when passed along to consumers, would *increase settlement costs*:

(a) The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. [. . . ]

(b) It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees *that tend to increase unnecessarily the costs of certain settlement services*[.]

12 U.S.C. § 2601(a)–(b) (emphasis added).

Consistent with Congress's intent to prohibit kickbacks, a plaintiff alleging a violation of RESPA Section 8(a) must plead "(1) a payment or thing of value; (2) made pursuant to an agreement to refer settlement business; and (3) an actual referral." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009) (cleaned up). But Section 8 also contains a "safe harbor" provision that exempts certain long-standing industry referral practices, including the referral flow at issue here. Among other things, Section 8 does not prohibit "payments pursuant to cooperative brokerage and referral arrangements or agreements between real estate agents and brokers." 12 U.S.C. § 2607(c)(3). That exemption encompasses the scenario where one real estate brokerage (e.g., Rocket Homes) refers business to another (e.g., the Mitchell Group) in exchange for a portion of any ensuing commission. (*See* Compl. ¶ 35.) It also exempts all payments between a brokerage and its agents. That exemption is dispositive of the Bureau's claims.

8

The Bureau's Section 8 claim also fails because the "thing of value" purportedly received by the Mitchell Group from Rocket Homes (referral flow) is in fact not a "thing of value" under RESPA at all—not based on the statutory text, not based on the considerable body of case law addressing similar arrangements, and not even based on the Bureau's regulatory interpretation of that text (which is not entitled to deference in any event). In addition, because RESPA also carries criminal penalties, the rule of lenity requires any ambiguity on that point to be resolved in favor of the Mitchell Group. Last, the Bureau's theory of liability is so novel that it violates the Mitchell Group's constitutional right to fair notice.

### 1. The Mitchell Group's alleged conduct is encompassed by the Section 8(c)(3) "safe harbor" for cooperative brokerage arrangements.

Section 8(c) sets forth "safe harbor" exemptions to the mandate of Section 8(a). The Bureau must allege facts in its Complaint that show these exemptions do not apply. *See PHH Corp. v. CFPB*, 839 F.3d 1, 49 n.27 (D.C. Cir. 2016) (rejecting the Bureau's argument that the RESPA safe harbor is an affirmative defense).[4]

In 1976, Congress amended RESPA to add Section 8(c)(3), which states that "nothing" in Section 8 "shall be construed as prohibiting . . . payments pursuant to cooperative brokerage and referral arrangements or agreements between real estate

---

[4]  The *PHH* opinion was vacated in part on other grounds after *en banc* review, but was reinstated "insofar as it related to the interpretation of RESPA." 881 F.3d 75, 83 (D.C. Cir. 2018). So the key portions of now-Justice Kavanagh's opinion remain good law.

agents and brokers." 12 U.S.C. § 2607(c)(3). *See also* Pub. L. 94-205. This exemption *permits* real estate brokerages to reward one another for referrals, typically by splitting any commission later received by the referred party following a closed transaction. Indeed, this exemption explains why the Bureau does not, and cannot, claim that the Mitchell Group (a real estate brokerage, *see* Compl. ¶ 15) or Rocket Homes (also a real estate brokerage, *see id.* ¶¶ 21–22) violates Section 8 when, following a referral from Rocket Homes, the Mitchell Group pays a portion of any ensuing commission back to Rocket Homes. (Compl. ¶¶ 35–37.)

That exemption works in both directions: just as the Mitchell Group's payment of a commission split to Rocket Homes is covered, so too is Rocket Homes' referral to the Mitchell Group. In other words, Section 8(c)(3) exempts the payment of a thing of value that, according to the Bureau, occurs when Rocket Homes (to reiterate, a real estate brokerage) refers consumers to the Mitchell Group (another real estate brokerage)—an arrangement that is expressly "not prohibited" under RESPA Section 8(c). And because Congress has already decided that the referral of leads between brokerages in exchange for a commission split is expressly not a RESPA violation, then that same referral of leads cannot abruptly *become* a RESPA violation merely because the Bureau alleges that it served a dual purpose as compensation for the Mitchell Group's alleged referral of consumers to Rocket Mortgage and Amrock.

The exemption also applies downstream. The Bureau alleges that the Mitchell Group violated Section 8(a) by paying monthly gift cards to its agents who made the most referrals to preferred providers of settlement services. (Compl. ¶¶ 70, 92.)[5] But under Section 8(c)(3), a real estate brokerage's payments *to its own agents* does not violate Section 8(a). This is conceptually well-grounded: intra-brokerage payments are simply revenue sharing between the brokerage and its agents, and do not increase costs to the consumer. In fact, no brokerage has *ever* been found to have violated RESPA Section 8(a) by paying its agents for *anything* in connection with referrals. The Bureau's claim that the Mitchell Group violated RESPA by giving gift cards to its agents is thus flatly barred under Section 8(c)(3).

The Bureau cannot cure these deficiencies through amendment: no amount of repleading will change the fact that the Bureau's theory of the case is based on conduct that is expressly lawful under Section 8(c)(3). Because leave to amend would be futile, Count II should be dismissed with prejudice.

### 2. The Mitchell Group's alleged conduct is encompassed by the Section 8(c)(2) "safe harbor" for services actually performed.

A second relevant statutory exemption is for "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished *or for services actually performed*." 12 U.S.C. § 2607(c)(2) (emphasis

---

[5]    If the Bureau had alleged that Rocket Mortgage or Amrock were paying those agents directly, this would be a different case, but that is not the allegation.

added); *see also* S. Rep. No. 93-866 (1974), *reprinted in* 1974 U.S. C.C.A.N. 6545, at 6551 ("Reasonable payments in return for services actually performed or goods actually furnished are not intended to be prohibited."); *Glover v. Standard Federal Bank*, 283 F.3d 953, 964 (8th Cir. 2002) (holding that the "permissive language of Section 8(c) . . . clearly states that reasonable payments for goods, facilities or services actually furnished are not prohibited by RESPA, even when done in connection with the referral of a particular loan to a particular lender").

Applying that exemption in the context of "referral flow" requires recognition of what a referral is: an *opportunity* to be paid *by the consumer* for services actually rendered. Where Rocket Homes refers a homebuyer to the Mitchell Group, it pays the Mitchell Group nothing; to get paid, the Mitchell Group's agent must perform his or her traditional function and help the buyer close the transaction, at which point the buyer pays a commission that benefits the Mitchell Group and its agent. The Bureau recognizes this. (Compl. ¶¶ 35–36.) Simply put, the only payment stream of financial consequence is between the *consumer* and the Mitchell Group, and, as the Bureau admits, those payments are for services actually rendered.

In a related context, a three-judge panel of the D.C. Court of Appeals (including now-Justice Kavanaugh) held that reinsurance "tying arrangements" (described by the Court as "We will refer customers to you, but only if you purchase another

service from our affiliated reinsurer, albeit at reasonable market value") are *not* pro-hibited by RESPA Section 8. That analysis reflects the reality that RESPA prohibits payments for referrals, not payments for services. *See PHH Corp.*, 839 F.3d at 41–43 ("[I]f [a party] makes a payment at reasonable market value for services actually provided, that payment is not a *payment for a referral.*"). In this scenario, the only "payments" at issue are the payments made by consumers *following* the referrals to the Mitchell Group from Rocket Homes. Because those payments are exempt under Section 8(c)(2), Rocket Homes' referral of the customers who made those pay-ments—which has no independent economic value—are as well.

Other courts have analyzed similar Section 8(a) claims using that frame of reference. For example, in *CFPB v. Borders & Borders, PLC*, a district court in this Circuit held that even if the defendant law firm's assignment of homebuyers to its joint venture title agencies were "things of value," the Section 8(c)(2) safe harbor applied because any payments made to the title agencies by the homebuyer "were not made in exchange for referrals, but in exchange for title insurance, which the consumers *actually received.*" No. 3:13-CV-01047-CRS, 2018 WL 1440606, at *2–4 (W.D. Ky. Mar. 22, 2018). The *Borders* court further found such payments were bona fide because the Bureau offered no evidence "that the consumers paid above

market value for the title insurance." *Id.* at \*4.[6]

Similarly, in *Cedeno v. IndyMac Bancorp, Inc.*, a New York federal district court held that the Section 8(c)(2) safe harbor applied where a lender referred business to appraisers, even where those entities provided inflated appraisals. No. 06 Civ. 6438 (JGK), 2008 WL 3992304, at \*2–4 (S.D.N.Y. Aug. 26, 2008). The *Cedeno* court assumed that inflated appraisals could constitute "things of value" but recognized that the appraisals were "performed and paid for" and, thus, could not be the basis for a Section 8(a) claim. *Id.* at \*4.[7]

Here, the Bureau has not satisfied its obligation to plead facts showing that the exemption does not apply: the Complaint in no way alleges or even implies that the Mitchell Group failed to "actually perform" the real estate services for which its customers paid a commission. Thus, because the only "payments" at issue in the

---

[6]   The Bureau's theory here is that consumers were harmed not by inflated real estate commissions or other settlement service fees, but rather by being "steered" to settlement service providers that did not offer certain benefits or discounts the consumers might have obtained elsewhere. (Compl. ¶¶ 76–81.) The Mitchell Group disputes that assertion, but in any event, in the 50 years of RESPA's existence, no court has ever recognized the nominal deprivation of comparison shopping as sufficient to establish a RESPA Section 8 violation, and for good reason. If correct, that premise would call into question the legality of all referral relationships, which are of course ubiquitous in the real estate industry.

[7]   The *Cedeno* court, by declining to analyze the "quality and price of the services actually performed" because "[t]hat interpretation exceeds the plain meaning of the statute," anticipated the Supreme Court's decision in *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624 (2012) (confirming that RESPA is not a "price control" statute). 2008 WL 3992304, at \*4.

14

Bureau's core theory of the case are those paid in the form of commission by consumers to the Mitchell Group for services actually rendered, Count II must be dismissed under the Section 8(c)(2) safe harbor.

### 3.    "Referral flow" is not a "thing of value" under Section 8.

The core conduct prohibited by Section 8(a) is the giving or acceptance of any "thing of value" as part of an agreement or understanding to refer real estate settlement services. The term "thing of value" is statutorily defined as "any payment, advance, funds, loan, service, or other consideration." 12 U.S.C. § 2602(2). The "things of value" that the Bureau contends were given by Rocket Homes to the Mitchell Group are "referral flow," "priority for referrals," and opportunities to participate in vague "experimental pilot programs" that ostensibly led to more referrals. (Compl. ¶¶ 9, 69, 92.) But clearly these things do not constitute a "payment, advance, funds, loan, [or] service," and the Bureau does not allege otherwise. Nor do they qualify as "other consideration," which under the *ejusdem generis* canon must be interpreted to mean similarly *tangible* kickbacks. *See Tiger Lily, LLC v. United States HUD*, 992 F.3d 518, 522–23 (6th Cir. 2021) (holding that a "catchall provision at the end of a list of specific items . . . embrace[s] only objects similar in nature to those objects enumerated by the preceding specific words").

This is not a novel argument. Courts around the country have construed "thing of value" to mean only tangible benefits (such as cash) that, when paid as a kickback, would increase the service provider's costs, thus potentially increasing the costs to

the consumer. Most notably, in *Borders*, the district court rejected the Bureau's argument that the assignment of business (functionally, a referral) constituted a "thing of value" under RESPA. There, a defendant law firm had established title insurance joint ventures with each of its partners, including real estate agents and mortgage brokers. *See* 2018 WL 1440606, at *1. When those agents and brokers referred consumers to the law firm for real estate closings, the firm would then "assign" consumers to the corresponding title insurance joint venture, subject to disclosure of joint ownership and a 30-day opt-out. *Id.* The *Borders* court held that steering those consumers to the joint venture was *not* a "thing of value" under RESPA:

> [T]his "nominal assignment" is insufficient to constitute a 'thing of value' because consumers were not obligated to follow the suggestion of Borders & Borders. Indeed, consumers had thirty days after the closing to decide whether to use the Title LLC suggested by Borders & Borders, or to use a different title insurance underwriter. If the consumer chose to purchase insurance from another underwriter, the [joint venture partner] involved with the case received nothing. This potential benefit is insufficient to constitute a 'thing of value' because it is entirely conditioned on the third-party consumer's choice.

*Id.* at *3. The Bureau did not appeal the *Borders* decision.

Other courts have rendered similar holdings. In *Taylor v. Gorilla Capital, Inc.*, a federal district court dismissed a Section 8(a) claim predicated on longstanding reciprocal referrals between two companies because "[s]imply doing 'a substantial amount of business' with a certain escrow company does not result in a violation of § 2607." No. 6:18-cv-648-MC, 2018 WL 3186946, at *6 (D. Or. June 28, 2018). And in *Gomez v. Wells Fargo Bank, N.A.*, the Eighth Circuit rejected the assertion

16

that a bank's referral of appraisal business to its preferred partners violated Section 8(a), finding that the ostensible thing of value—the referring party's ostensible control over the "outcome of the appraisal"—was "too different in kind from the kickbacks and fees listed in the statutory and regulatory definitions[.]" 676 F.3d 655, 659–64 (8th Cir. 2012).

Here, additional referrals—and, a step further removed, *priority* for referrals—fall in the same category of intangible benefits akin to those rejected as insufficient in *Borders*, *Taylor*, and *Gomez*. Not only is a referral itself merely the *possibility* of a benefit—because a homebuyer may elect not to follow the referral, or may not close on a home at all—but it is also fundamentally different from a cash payment or similar kickback that might be "passed along" to the consumer and result in the type of settlement cost increase that RESPA was designed to prevent.

### 4. The Bureau cannot state a claim based on 12 C.F.R. § 1024.14(d).

The Bureau sidesteps this *statutory* analysis entirely, and instead pleads that referral flow is a "thing of value" under Regulation X—specifically, an "opportunity to participate in a money-making program." (Compl. ¶¶ 10 (citing 12 C.F.R. § 1024.14(d)), 31, 81.) That claim fails for several reasons.

First, following *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024), this Court should afford deference to the Bureau's interpretation of statutory

language only where "the statute expressly confers discretion on the agency." *Mocte-zuma-Reyes v. Garland*, 124 F.4th 416, 421 (6th Cir. 2024). That occurs where Congress "empower[s] an agency to regulate in accordance with its 'judgment' or 'opinion,' or when the agency 'finds' some condition to hold true." *Id.* Although RESPA authorizes the Bureau "to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter," 12 U.S.C. § 2617(a), it does not "expressly confer discretion" using the hallmark language identified only months ago by the Sixth Circuit. So the Bureau's interpretive gloss on the statutory definition of "thing of value"—i.e., its injection of the term "opportunity to participate in a money-making program"—should be disregarded.

Second, even if Regulation X sets forth the relevant standard, the Bureau's claim still fails. The term "money-making program" implies a structured initiative such as a franchise or formal partnership. Referral flow, by contrast, is an amorphous and intangible proposition with no guarantee of "money-making" by *anyone*. For instance, the *Borders* court analyzed whether the referral of a homebuyer to a title insurance joint venture qualified under Regulation X, and concluded that a referral, as a "*potential* benefit"—i.e., one that, as set forth *supra*, carries no value independent of a possible later payment by the consumer—was not a "thing of value." 2018 WL 1440660, at *3. The same result should obtain here.

18

Third, a violation of Section 8 is subject to both civil *and criminal* penalties—meaning that the rule of lenity applies to *all* aspects of the interpretation of Section 8, including in the purely civil context. *See Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 727 (6th Cir. 2013) (applying rule of lenity to interpret Section 8); *see also, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004) ("Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies."). This Court must therefore interpret any ambiguity in Section 8 *against* the government. *Leocal*, 543 U.S. at 11–12 n.8.

Fourth, the Bureau's attempt at "regulation by enforcement"—i.e., advancing a novel theory of liability for the first time in an enforcement action, rather than through traditional rule-making—violates the Mitchell Group's due process rights. *See PHH Corp.*, 839 F.3d at 44–49 ("In sum, even if the CFPB's new interpretation of Section 8 were a permissible interpretation of the statute, which it is not, the CFPB's interpretation could not constitutionally be applied retroactively to PHH's conduct that occurred before that new interpretation."); *see also Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995) ("In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability."); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974) ("It is

one thing to expect regulated parties to conform their conduct to an agency's inter-
pretation once the agency announces them; it is quite another to require regulated
parties to divine the agency's interpretations in advance or else be held liable when
the agency announces its interpretations for the first time in an enforcement proceed-
ing and demands deference.").

Here, as set forth at length *supra*, the Bureau's own rule-making (let alone the
statutory text) has *never* suggested that "referral flow" or "priority for referrals"
could be a "thing of value." As the Bureau acknowledges, referrals between broker-
ages subject to commission splits are business as usual, (Compl. ¶ 10), because mak-
ing referrals to a trusted partner is not a kickback that increases a consumer's closing
costs, *see* 12 U.S.C. § 2601(b) (describing Congressional purpose behind RESPA).
Instead, for the first time in an enforcement action, the Bureau is attempting to turn
an anti-*kickback* statute into an anti-*steering* statute. That abrupt about-face violates
the Mitchell Group's due process right to fair notice, and Count II should be dis-
missed on that basis.

### B.   The Complaint engages in impermissible shotgun pleading.

"[A] complaint which lumps all defendants together and does not sufficiently
allege who did what to whom, fails to state a claim for relief because it does not
provide fair notice of the grounds for the claims made against a particular defend-
ant." *Fedorova v. Foley*, No. 1:22-cv-991, 2023 WL 4064542, at *5 (W.D. Mich.

May 30, 2023), *R&R adopted*, 2023 WL 4077758 (W.D. Mich. June 20, 2023) (recommending dismissal of RESPA claims); *see also Dobronski v. Tobias & Assocs., Inc.*, No. 23-10331, 2024 WL 1174553, at *2–4 (E.D. Mich. Mar. 18, 2024) (dismissing claim for "impermissible group pleading" under Fed. R. Civ. P. 8(a)(2)). Moreover, in the RESPA context, a complaint must specify "the circumstances surrounding" the alleged illegal transactions, including when such transactions occurred. *GMAC Mortg., LLC v. McKeever*, No. 08-459-JBC, 2010 WL 3470312, at *5 (E.D. Ky. Aug. 31, 2010).

Here, the Complaint asserts claims against *46 different limited liability companies*, but fails to identify any specific payment or referral made to or by *any* of those companies in violation of RESPA. The Complaint doesn't even allege that every one of the Mitchell Brokerages *received* referrals from Rocket Homes. Instead, the Complaint broadly asserts that unspecified entities in the Mitchell Group received "thousands of referrals" from Rocket Homes, in unspecified localities, over the course of unspecified years. (Compl. ¶¶ 69–75). Some unspecified mix may have participated in "experimental pilot programs" of an ill-defined nature. (Compl. ¶ 75.) Nor does the Complaint allege which of the Mitchell Brokerages recommended that their agents refer consumers to Rocket Homes or Amrock, or whether those transactions actually closed. This is shotgun pleading at its worst, and it warrants dismissal.

**C.    The Complaint should be dismissed to the extent it is predicated on conduct that predates the three-year statute of limitations.**

The Bureau must file a RESPA claim "within 3 years from the date of the occurrence of the violation." 12 U.S.C. § 2614. A Section 8 violation is deemed to "occur" on the date of the specific mortgage loan closing implicating the "payment" at issue. *See, e.g., Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 421 (6th Cir. 2009) (calculating statute of limitations from date of closing); *Procopio v. Guaranteed Rate, Inc.*, No. 10-13284, 2011 WL 1627326, at *6–7 (E.D. Mich. Apr. 29, 2011) (summarizing cases). As explained *supra*, "referral flow" is not a "thing of value" at all, but if it were, it would become valuable only if and when it resulted in a payment from a homebuyer to the Mitchell Group—and so, consistent with Sixth Circuit precedent, the statute of limitations would run from the date of the closing when the commission is paid. The Bureau filed its Complaint on December 23, 2024, such that Count II is timely only as to loan closings that occurred on or after December 24, 2021.

Because the statute of limitations is an affirmative defense, a plaintiff need not expressly plead that it is satisfied, but dismissal is appropriate where the plaintiff pleads facts showing that the relevant conduct occurred *outside* the limitations period. *See Rembisz v. Lew*, 590 F. App'x 501, 503–04 (6th Cir. 2014). Here, the Bureau *has* pleaded itself out of court as to the Mitchell Group because its few references to specific dates of conduct that allegedly violated Section 8 occurred well

before December 24, 2021. (*See, e.g.,* Compl. ¶¶ 38 (referring to conduct "[b]egin-ning on or around 2019"), 41–42 (describing Rocket Homes' 2019 terms and condi-tions), 71–73 (describing emails sent by Jason Mitchell in May 2019 and March 2021)). That conduct affirmatively *cannot* amount to a viable Section 8 claim be-cause, among the Bureau's many other pleading defects, the conduct falls outside the statute of limitations.

The Bureau may point to a single highly abstract assertion that unspecified members of the Mitchell Group received referrals from Rocket Homes and made referrals to Rocket Mortgage and Amrock "through at least March 2022" (Compl. ¶ 74). That allegation, like many others, is undermined by its flagrant group plead-ing, because it leaves this Court to guess *which* of the Mitchell Brokerages were involved in that conduct during that time frame.

No guesswork is ultimately necessary, however, because the pleading fails for a more fundamental reason: the Bureau does not allege that a single referral to the Mitchell Group from December 2021 onward actually resulted in a *closing of a fed-eral mortgage loan*—i.e., the triggering event for the limitations period to start run-ning. *See Procopio*, 2011 WL 1627326, at *6–7; Compl. ¶¶ 69–75. In the absence of even the most bare-bones allegation that a single homeowner closed a single loan with the assistance of a Mitchell Brokerage based on a Rocket Homes referral during the limitations period, Count II of the Complaint should be dismissed.

23

**D.    This Court lacks federal question jurisdiction because the CFPB is unlawfully funded.**

The Complaint should be dismissed for a final reason: this Court lacks federal question jurisdiction because the Bureau's current funding is unlawful. As the Supreme Court recently affirmed, the Bureau's funding mechanism is "subject to the requirements of the Appropriations Clause," which requires "Appropriation[s] made by Law." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,* 601 U.S. 416, 425 (2024) (quoting U.S. Const. Art. I, § 9, cl. 7). The relevant "Law" is the Dodd-Frank Act, which authorizes the CFPB to draw public funds for its expenses from a sole source—"the combined *earnings* of the Federal Reserve System." *Id.* at 435 (quoting 12 U.S.C. §§ 5497(a)(1), (2)(A)-(B)) (emphasis added).

The "combined earnings" of the Federal Reserve refers to its *net* earnings. 12 U.S.C. §289(a)(2). The Federal Reserve, however, last reported a profit in September 2022, such that those earnings do not exist.[8] Because the Federal Reserve has continued to transfer funds to the Bureau in the interim, the CFPB's current operations have actually been unlawfully funded by the Federal Reserve's *deficit.*

Dodd-Frank contains a framework for the Bureau to remain funded under these circumstances. *See* 12 U.S.C. §5497(e)(1) (allowing the Bureau's Director to

---

[8]    *See* "Federal Reserve Balance Sheet Developments, December 2024," *available at* https://www.federalreserve.gov/monetarypolicy/December-2024-Federal-Reserve-Balance-Sheet-Developments.htm. The Court may take judicial notice of the content of a government agency's website. *See Hadley v. Chrysler Grp. LLC*, No. 13-13665, 2014 WL 988962, at *2 n.2 (E.D. Mich. Mar. 13, 2014).

submit a report to the President and congressional appropriations committees). But the Bureau has not done that, and instead is operating on—and has initiated this enforcement action using—funds that have not been properly appropriated. Because the Bureau's efforts as plaintiff in this lawsuit are unlawfully funded, this Court dismiss the complaint for lack of subject-matter jurisdiction.

## V.    **CONCLUSION**

The Complaint fails to state a claim for a multitude of reasons: two express statutory exemptions apply to the alleged conduct at issue; the Bureau has failed to plead the giving or acceptance of a thing of value under RESPA Section 8; the Complaint is a model of impermissible group pleading; the conduct at issue falls outside the statute of limitations; and the Court lacks subject-matter jurisdiction because the Bureau filed this lawsuit based on unlawful funding. Because leave to amend would be futile, the Complaint should be dismissed with prejudice.

Date: February 21, 2025

/s/ *Thomas F. Burke*
Thomas F. Burke
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
P: 215.665.8500
BurkeT@ballardspahr.com

Aaron Schaer
**BALLARD SPAHR LLP**
13313 Balfour Ave.
Huntington Woods, MI 48070
Telephone:  (206) 223-7103
SchaerA@ballardspahr.com

*Counsel for the Mitchell Group*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 21, 2025, a true copy of the foregoing has been filed electronically with the Eastern District of Michigan Clerk of Court and copies have been furnished electronically and by email upon all counsel of record, including:

> David Dudley
> David.Dudley@cfpb.gov
> Colleen Fewer
> Colleen.Fewer@cfpb.gov
> Consumer Financial Protection Bureau
> 1700 G. Street NW
> Washington, DC 20552
>
> Dawn N. Ison
> Kevin Erskine
> Kevin.Erskine@usdoj.gov
> United States Attorney's Office
> 211 W. Fort St., Suite 2001
> Detroit, MI 48226
>
> *Attorneys for the Consumer Financial Protection Bureau*

Dated:  February 21, 2025                    Respectfully submitted,

                                                        */s/ Thomas F. Burke*
                                                        Thomas F. Burke