**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

CONSUMER FINANCIAL
PROTECTION BUREAU,
　　　　　*Plaintiff*

v.

JMG HOLDING PARTNERS LLC, et
al.,
　　　　　*Defendants*

No. 2:24-cv-13442-BRM-KGA

Hon. Brandy R. McMillion
District Judge

**ROCKET HOMES REAL ESTATE LLC'S**
**MOTION TO DISMISS COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Rocket Homes Real

Estate LLC ("Rocket Homes"), by and through its undersigned attorneys, hereby

moves to dismiss with prejudice the Complaint of Plaintiff Consumer Financial Pro-

tection Bureau ("Bureau"), for the reasons set forth in its accompanying Brief in

Support.

Counsel for Rocket Homes (Levi W. Swank) certifies that on February 17,

2025, he emailed counsel for the Bureau (David Dudley) asking to meet and confer

with the Bureau to seek concurrence in the relief sought by this Motion, pursuant to

Local Rule 7.1(a).  Mr. Swank received an automated response that Mr. Dudley was

"unable to respond . . . at this time."  On February 18, 2025, Mr. Swank reiterated

his request by email, and also provided counsel for the Bureau with the specific grounds on which this Motion is based.  On February 20, 2025, Mr. Swank attempted to reach counsel for the Bureau (Mr. Dudley) by telephone but the call was not answered and the voicemail requesting a meet and confer was not returned.  Mr. Dudley responded to Mr. Swank's email of February 18 at 8:56 PM on February 20, stating only that he had been authorized to ask whether Rocket Homes would agree to a 60-day stay of the case.

WHEREFORE, Rocket Homes respectfully requests that this Court GRANT this Motion in its entirety and dismiss the Bureau's Complaint with prejudice.

Dated: February 21, 2025                    Respectfully submitted,

/s/ Jason R. Hirsch                         Levi W. Swank
Jason R. Hirsch (P58034)                    W. Kyle Tayman
Jeffrey B. Morganroth                       GOODWIN PROCTER LLP
MORGANROTH &                                1900 N Street, N.W.
MORGANROTH, PLLC                            Washington, DC 20036
344 North Old Woodward Avenue               Tel.: (202) 346-4000
Suite 200                                   Fax: (202) 346-4444
Birmingham, MI 48009                        LSwank@goodwinlaw.com
Tel.: (248) 864-4000                        KTayman@goodwinlaw.com
Fax: (248) 864-4001
jhirsch@morganrothlaw.com                   *Attorneys for Rocket Homes Real*
jmorganroth@morganrothlaw.com               *Estate LLC*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

CONSUMER FINANCIAL
PROTECTION BUREAU,
      *Plaintiff*

v.

JMG HOLDING PARTNERS LLC, et
al.,
      *Defendants*

No. 2:24-cv-13442-BRM-KGA

Hon. Brandy R. McMillion
District Judge

**BRIEF IN SUPPORT OF ROCKET HOMES REAL ESTATE LLC'S
<u>MOTION TO DISMISS COMPLAINT</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF ISSUES PRESENTED................................................................v

CONTROLLING OR MOST APPROPRIATE AUTHORITY ............................vi

I.     INTRODUCTION ..................................................................................1

II.    BACKGROUND ....................................................................................2

III.    ARGUMENT.........................................................................................5

        A.    Rocket Homes' Arrangements With Its Partner Brokerages Are Categorically Exempt From Section 8 Liability. ................................7

        B.    The Bureau Has Not Plausibly Alleged that Preserving and Protecting the Client's Chosen Lender Is a "Referral," Or That Rocket Homes Gave Partner Brokerages Any "Thing of Value" in Return. ...................................................................................10

            1.    Preserving and Protecting the Client's Chosen Lender Was Not a "Referral" to Rocket Mortgage. .............................10

            2.    The Bureau Fails to Plausibly Allege That Partner Brokerages Received A "Thing of Value" From Rocket Homes in Exchange For Any "Referral" to Rocket Mortgage. ................................................................................15

        C.    The Bureau Has Not Plausibly Alleged a Reciprocal Referral Arrangement Between Rocket Homes and Its Partner Brokerages. ......................................................................................18

            1.    The Complaint Does Not Plausibly Allege an "Agreement or Understanding" Between Rocket Homes and the Mitchell Group to Reciprocate Referrals. ...................18

            2.    The Complaint Does Not Plausibly Allege an "Agreement or Understanding" Between Rocket Homes and Any Other Brokerage Partner to Reciprocate Referrals. ................................................................................22

        D.    The Bureau's Lawsuit Should Be Dismissed Because It Was Filed and Is Being Prosecuted Using Unlawfully Obtained Funds. .......................................................................................24

IV.    CONCLUSION....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................21

*Aslam v. United States Dep't of State*,
2023 WL 6163969 (D. Utah Sept. 21, 2023)......................................................25

*Carter v. Welles-Bowen Realty, Inc.*,
736 F.3d 722 (6th Cir. 2013) .........................................................10, 13

*CFPB v. Borders & Borders, PLC*,
2018 WL 1440606 (W.D. Ky. Mar. 22, 2018) .................................................17

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
601 U.S. 416 (2024)......................................................................................24

*Cmty. Fin. Servs. Ass'n of Am. v. CFPB*,
51 F.4th 616 (5th Cir. 2022), *rev'd and remanded on other
grounds*, *CFSA,* 601 U.S. 416 (2024)...............................................................25

*Egerer v. Woodland Realty, Inc.*,
556 F.3d 415 (6th Cir. 2009) ........................................................................10

*Freeman v. Quicken Loans, Inc.*,
566 U.S. 624 (2012)......................................................................................19

*Galiano v. Fid. Nat. Title Ins. Co.*,
684 F.3d 309 (2d Cir. 2012) .........................................................................22

*Gomez v. Wells Fargo Bank, N.A.*,
676 F.3d 655 (8th Cir. 2012) ........................................................................17

*Keen v. Helson*,
930 F.3d 799 (6th Cir. 2019) ........................................................................12

*Kolpacke v. Moore Sales Corp.*,
2013 WL 6511862 (E.D. Mich. Dec. 12, 2013) ..............................................19

*Krupa v. Landsafe, Inc.*,
514 F.3d 1153 (11th Cir. 2008) ................................................................21

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024).............................................................................13, 17

*Stith v. Thorne*,
488 F. Supp. 2d 534 (E.D. Va. 2007) ...............................................19, 23

*Taylor v. Gorilla Capital, Inc.*,
2018 WL 3186946 (D. Or. June 28, 2018) ...............................................22

*Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*,
992 F.3d 518 (6th Cir. 2021) ...................................................................16

**Statutes**

12 U.S.C. § 289(a)(2)................................................................................24

12 U.S.C. § 2601(b) ..................................................................................16

12 U.S.C. § 2602(2) ..................................................................................16

12 U.S.C. § 2607(a) .................................................................1, 5, 15, 18

12 U.S.C. § 2607(c)(3)..................................................................... 1, 5, 8

12 U.S.C. § 2607(c)(5)................................................................................8

12 U.S.C. § 5497(a)(1)..............................................................................24

12 U.S.C. § 5497(a)(1)-(2)........................................................................24

**Other Authorities**

12 C.F.R. § 1024.14(b) .............................................................................21

12 C.F.R. § 1024.14(d) ..........................................................................8, 17

12 C.F.R. § 1024.14(f)(1) ....................................................................13, 14

12 C.F.R. § 1024.14(g)(1)(v) .....................................................................8

## STATEMENT OF ISSUES PRESENTED

1. Whether the Complaint fails to state a claim against Rocket Homes because it is based entirely on allegedly improper payments exchanged between Rocket Homes and its partner brokerages "pursuant to cooperative brokerage and referral arrangements," which are categorically exempt from RESPA liability under the 12 U.S.C. § 2607(c)(3) safe harbor.

2. Whether the Complaint's "preserve and protect" theory of RESPA liability fails to state a claim against Rocket Homes because:

   a. the Complaint has not plausibly alleged that Rocket Homes engaged in an agreement with partner brokerages to make referrals of new mortgage business to Rocket Mortgage because the conduct at issue involved preserving and protecting the borrower's relationship with the lender they had already selected.

   b. the Complaint has not plausibly alleged that the supposed improper inducement, continued eligibility for future referrals from Rocket Homes, is concrete enough to meet the statutory requirement that there to be a "thing of value" exchanged for the referral of settlement services business.

3. Whether the Complaint's "reciprocal referral" theory of RESPA liability fails to state a claim against Rocket Homes because the Complaint does not plausibly allege the existence of any "agreement or understanding" between Rocket Homes and any of its partner brokerages to reciprocate referrals.

4. Whether the Complaint is barred because it was filed and is being litigated with funds transferred to the Bureau in violation of statutory requirements that restrain its funding.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

1.   *Freeman v. Quicken Loans, Inc.,* 566 U.S. 624, 636 n.9 (2012) (to establish an "agreement or understanding," RESPA "has always required two culpable parties for a violation.");

2.   *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 728 (6th Cir. 2013) (statutory safe harbors in RESPA should be strictly enforced);

3.   *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 663-64 (8th Cir. 2012) ("the possibility" of a benefit is not a "thing of value" under RESPA);

4.   *CFPB v. Borders & Borders, PLC*, 2018 WL 1440606, at \*3 (W.D. Ky. Mar. 22, 2018) (a "potential benefit is insufficient to constitute a 'thing of value'" under RESPA);

5.   *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 370, 394, 400-401 (2024) (holding that courts need not defer to an agency's construction of an ambiguous statute, nor does an agency interpretation warrant respect where it was not "issued roughly contemporaneously with enactment of the statute");

6.   *Galiano v. Fid. Nat. Title Ins. Co.*, 684 F.3d 309, 315 (2d Cir. 2012) (to state a RESPA Section 8(a) claim, a plaintiff must allege "specifics as to the date, time, or amount of the alleged Section 8(a) violations").

## I.    INTRODUCTION

This is a case of overreach and disregard for statutory constraints by the Consumer Financial Protection Bureau (the "Bureau").

The Bureau brings one claim against defendant Rocket Homes Real Estate LLC ("Rocket Homes") for alleged violations of Section 8(a) of the Real Estate Settlement Procedures Act ("RESPA") in connection with its referrals of real estate business to other real estate brokerages.  *See* 12 U.S.C. § 2607(a).  That claim is barred for a simple and straightforward reason:  RESPA categorically exempts "cooperative brokerage and referral arrangements" among real estate brokers – the type of arrangement the Bureau alleges exists here – from Section 8(a) liability.  *See* 12 U.S.C. § 2607(c)(3).  And, even if the entire lawsuit does not fail for this simple reason, dismissal is still required because the Bureau has failed to plausibly allege any of the three required elements of a RESPA Section 8(a) claim – (i) a "thing of value" given by Rocket Homes, (ii) pursuant to an "agreement or understanding" with other brokers, (iii) that settlement service business would be "referred" to a person.  12 U.S.C. § 2607(a).  These fatal pleadings defects warrant dismissal.

That result is sound policy, too.  Congress enacted RESPA to target a "system of referral fees" among settlement services providers that left the consumer with "a small voice in [the] decision" of selecting a provider.  Ex. 2, STAFF OF S. DEP'T OF HOUS. AND URBAN DEV. AND VETERANS ADMIN., COMM.  ON BANKING, HOUS. AND

URB. AFF., 92d Cong., MORTGAGE SETTLEMENT COSTS 15-16 (Comm. Print 1972).[1]

RESPA therefore sought to "minimize[]" "unnecessary costs and difficulties of purchasing housing," Ex. 3, COMM. ON BANKING AND CURRENCY,  REAL ESTATE SETTLEMENT PROCEDURES ACT OF 1974, H.R. REP. No. 93-1177, at 1 (2d Sess. 1974), and ensure that settlement services providers added "real benefits" to consumers, Ex. 4, COMM. ON BANKING AND CURRENCY, PROVIDING FOR GREATER DISCLOSURE OF THE NATURE AND COSTS OF REAL ESTATE SETTLEMENT SERVICES, S. REP. NO. 93-866, at 2 (2d Sess. 1974).  The real benefits that Rocket Homes has provided to potential homeowners, by connecting them to other real estate brokerages who can help them find a new home, cannot be doubted – nor is it contested in the Complaint. For nearly two decades, Rocket Homes has helped some 200,000 mostly first-time homebuyers find their dream home by providing a better, simpler, and more empowering homebuying process for every client, every time, without exception.

## II.    BACKGROUND

### A.    Rocket Homes

Rocket Homes was created to solve pervasive challenges faced by consumers looking to purchase a home – one of the most complex, stressful, and significant financial decisions in a person's life.  Consumers need a trusted advisor who can

---

[1] Ex. 1 hereto is the Declaration of Levi W. Swank ("Swank Declaration"), which affirms that the other exhibits attached hereto are true and accurate copies.

educate, help, and empower them to navigate these challenges with confidence and certainty.  But there is a dearth of information needed to make an informed choice among the 100,000+ real estate brokerages across the country.  If the only observable difference is the sign out front, a consumer has no recourse but to roll the dice and hope the broker they choose has the expertise they need.  This difficulty is faced most acutely by consumers who are relocating out of state or are first-time home buyers.  These consumers often lack a pre-existing relationship with a brokerage in their search area but need a high-quality and experienced agent the most.

Rocket Homes is a licensed real estate brokerage founded in Detroit, Michigan in 2006.  ECF No. 2, PageID.43 ¶ 15.  In its early days, and until about 2019, Rocket Homes worked primarily with consumers who had applied for financing with its sister company, Rocket Mortgage.  *Id.*, PageID.49 ¶ 33.  More recently, Rocket Homes has worked with a growing number of clients who have no preexisting relationship with Rocket Mortgage, but who seek to leverage Rocket Homes' innovative home search platform.  *Id.*, PageID.50-51 ¶ 38.  To help a client find a home, Rocket Homes leverages its nationwide network of 20,000+ experienced and top-rated brokers and agents to identify a partner brokerage located in the area of the consumer's home search.  *Id.*, PageID.49 ¶¶ 32-33.  Rocket Homes and the local partner brokerage are co-brokers; the client relies on the local brokerage for on-the-ground support, and trusts Rocket Homes to oversee the transaction in alignment with the client's

goals.  To ensure exemplary client service, the real estate agents and brokers in the network must agree to certain terms and conditions to be eligible to co-broker with Rocket Homes, *i.e.*, receive referrals.  *Id.*, PageID.51 ¶ 40.  One of the many such terms and conditions is that broker partners agree to "preserve and protect . . . the client's chosen lender" and not "affirmatively steer" the client away from their chosen lender.  *Id.*, PageID.52 ¶ 41.

## B.     This Lawsuit

In this lawsuit, the Bureau attempts to contort broker partners' agreement to "preserve and protect" the client's chosen lender into something nefarious, and then extrapolates malintent to all of Rocket Homes' interactions with its partner brokerages.  The Complaint asserts one RESPA Section 8(a) claim against Rocket Homes under two distinct theories:  (i) that Rocket Homes gave a "thing of value" to its broker partners – namely, continued eligibility in its partner network – pursuant to an agreement or understanding that the broker partner would affirmatively "steer" that mutual client to Rocket Mortgage, *id.*, PageID.41-42 ¶ 10, PageID.66-67 ¶¶ 89-90) (the "preserve and protect" theory); and (ii) that Rocket Homes gave certain broker partners "priority for future referrals" in exchange for those brokers referring their home-grown clients to Rocket Mortgage for financing and/or Amrock (n/k/a Rocket Close) for title, closing, and escrow services, *id.*, PageID.41 ¶ 8, PageID.66-67 ¶¶ 89-90 (the "reciprocal referral" theory).

## III.   ARGUMENT

The Complaint should be dismissed with prejudice in its entirety because both of the Bureau's theories of Rocket Homes' RESPA liability are predicated on referrals made by the Rocket Homes real estate brokerage to partner real estate brokerages with whom it co-brokers.  That dooms the Bureau's RESPA claim because RESPA provides a categorical safe harbor from Section 8(a) liability for payments made pursuant to "cooperative brokerage and referral arrangements" like those between Rocket Homes and its real estate brokerage partners.  *See* 12 U.S.C. § 2607(c)(3). *See* Ex. 5, COMM. ON BANKING, CURRENCY AND HOUS., REAL ESTATE SETTLEMENT PROC., H.R. 94-677, at 2 (1st Sess. 1975) ("cooperative brokerage and referral arrangements . . . are exempt from the prohibition of kickbacks").

Even setting aside this threshold bar, the Bureau has failed to plausibly allege any of the three required elements of its claim.  Section 8(a) prohibits giving or receiving any "fee, kickback, or thing of value pursuant to any agreement or understanding . . . that business incident to or a part of a real estate settlement service . . . shall be referred to any person."  12 U.S.C. § 2607(a).  As to its preserve and protect theory, the Bureau has failed to plausibly allege the third element, that business was "referred" to a person (Rocket Mortgage) based on the alleged conduct.  Under the terms and conditions governing Rocket Homes' relationship with other brokers – that is, under the "agreement or understanding" the Bureau alleges as the first

element of its claim – the brokers agreed to preserve and protect the client's "chosen lender." ECF No. 2, PageID.52 ¶ 41. The Bureau thinks the "preserve and protect" term was illegal because it amounted to Rocket Homes causing a referral of business to Rocket Mortgage. But the theory is self-defeating: the "business incident to or a part of a real estate settlement service . . . [which] shall be referred to any person" that was the object of the alleged violation was *already with* Rocket Mortgage. It is logically impossible to allege any RESPA claim predicated on the terms-and-conditions promise that a broker "preserve and protect" the client's previous choice to create a "preexisting relationship" with Rocket Mortgage. *Id.*, PageID.54 ¶ 48. That agreement to support the consumer's choice, and the concomitant agreement by brokers to not "purposefully steer[]" the consumer to the broker partner's favored lender, *id.,* Page ID.52 ¶ 41, is not a "referral" to Rocket Mortgage.

Separately, and in any event, broker partners received no "thing of value" in return for agreeing to preserve and protect the client's chosen lender, thereby failing to allege the second element of a Section 8(a) claim. The Bureau alleges that the "thing of value" broker partners received is their "ability" to receive future referrals from Rocket Homes. *See* ECF No. 2, PageID.41 ¶ 10. But the mere possibility of future referrals is too speculative to constitute a "thing of value" under RESPA.

The Bureau's reciprocal referral theory – that Rocket Homes provided "additional referrals" to brokerages that referred their "home-grown clients" to Rocket

Mortgage and a sister company, Amrock – also fails to state a RESPA claim. *Id.*, Page ID.58 ¶ 64. On this claim, the terms and conditions say nothing about reciprocal referrals. And the Complaint otherwise pleads no facts raising a plausible inference to support the first claim element, that Rocket Homes had the requisite "agreement or understanding" to reciprocate referrals with the Jason Mitchell Group ("Mitchell Group") family of brokers or any other partner brokerage.

Finally, this lawsuit is also barred because the Bureau filed it and is prosecuting it using funds obtained in violation of statutory limits on its funding imposed by the Consumer Financial Protection Act ("CFPA"). As a result, the Bureau has no lawful authority to prosecute this case, and it should be dismissed with prejudice.

## A. Rocket Homes' Arrangements With Its Partner Brokerages Are Categorically Exempt From Section 8 Liability.

Under both of its theories, the Bureau contends that Rocket Homes violated Section 8(a) of RESPA by giving a "thing of value" to its real estate brokerage partners pursuant to an agreement or understanding that those brokerages would make a "referral" to Rocket Mortgage and/or Amrock. ECF No. 2, PageID.41-42 ¶¶ 8-10. The Bureau's claim against Rocket Homes is barred as a matter of law, however, because the statute categorically exempts cooperative brokerage and referral relationships between real estate brokerages from Section 8(a) liability.

Section 8(c)(3) of RESPA provides that nothing in Section 8 "shall be construed as prohibiting . . . payments pursuant to cooperative brokerage and referral

-7-

arrangements or agreements between real estate agents and brokers." 12 U.S.C. § 2607(c)(3). Only two straightforward requirements must be met for the safe harbor to apply: (1) the parties must be "real estate brokerage[s]," and (2) the "payments" being given or received must be "pursuant to cooperative broker and referral arrangements" or "agreements between real estate agents and brokers." 12 U.S.C. § 2607(c)(3); 12 C.F.R. § 1024.14(g)(1)(v). Both elements are satisfied here.

First, both parties to the alleged Section 8(a) violation are real estate brokerages. Rocket Homes is a real estate brokerage (ECF No. 2, PageID.43 ¶ 15), as are its real estate brokerage partners (*id.*, PageID.39 ¶ 3, PageID.43 ¶ 15).

Second, the Bureau asserts that "payments" are being made by Rocket Homes "pursuant to cooperative brokerage and referral arrangements." Here, the Complaint alleges that Rocket Homes made improper "payments" for referrals to Rocket Mortgage and/or Amrock by giving its broker partners "the ability to receive future referrals" and/or "priority for future referrals." *Id.*, PageID.66-67 ¶ 90. These are exempt "payments" for purposes of Section 8(c)(3). *See* 12 C.F.R. § 1024.14(d) (defining the term "payments" in Section 8 "as synonymous with the giving or receiving of any 'thing of value'").[2] The legislative history of Section 8(c)(3) makes clear that

---

[2] Unlike its authority to interpret other provisions of RESPA, which as explained below is not subject to deference, Congress expressly gave the the Bureau wider latitude to define the term "payments" under the statute. *See* 12 U.S.C. § 2607(c)(5) (exempting from Section 8 liability "such other payments or classes of payments or other transfers as are specified in regulations prescribed by the Bureau").

Congress intended to broadly exempt from liability all forms of "kickbacks" made pursuant to cooperative brokerage and referral arrangements. *See* Ex. 5, H.R. 94-667, at 2 (stating that the amendment's purpose was "to make it clear that cooperative brokerage and referral arrangements of real estate agents are exempt from the prohibition of kickbacks and unearned fees"). Congress's decision to exempt such arrangements from RESPA's anti-kickback provision makes good sense from a policy perspective, given the wide latitude a real estate brokerage should be afforded in selecting a co-broker with whom it will jointly represent a client.

The Complaint also alleges that the payments Rocket Homes gave to its partner brokerages were "pursuant to cooperative brokerage and referral arrangements." Rocket Homes made referrals to partner brokerages and then cooperated (*i.e.*, worked with them) to effect the purchase of a home, pursuant to an "arrangement" between Rocket Homes and the partner brokerage governed by standard Terms and Conditions and a transaction-specific Client Profile and Referral Agreement. *See* ECF No. 2, PageID.49-50 ¶¶ 32-37, PageID.52-54 ¶¶ 42-47, PageID.55 ¶¶ 49-50. Thus, taken at face value, the Complaint concerns alleged "payments" between real estate brokerages made "pursuant to cooperative brokerage and referral arrangements" – alleged conduct that meets the Section 8(c)(3) safe harbor.

To be clear, and as shown below, the Bureau has not plausibly alleged conduct that would constitute a violation of Section 8(a) even absent the Section 8(c)(3) safe

-9-

harbor.  But the Court need not reach those pleadings defects here.  Congress meant what it said in creating safe harbors to liability under Section 8, and the statute's text should be applied as written.  *See Carter v. Welles-Bowen Realty, Inc*., 736 F.3d 722, 728 (6th Cir. 2013).  The Court should dismiss the case against Rocket Homes with prejudice because the alleged conduct falls within the Section 8(c)(3) safe harbor.

**B.  The Bureau Has Not Plausibly Alleged that Preserving and Protecting the Client's Chosen Lender Is a "Referral," Or That Rocket Homes Gave Partner Brokerages Any "Thing of Value" in Return.**

The Complaint asserts that by encouraging its partner brokerages to "preserve and protect the client's chosen lender," Rocket Homes violated Section 8(a) because it "conditioned the right to receive future referrals . . . on real estate brokers' and agents' agreement to refer their clients to Rocket Mortgage."  ECF No. 2, PageID.51. To state a Section 8(a) claim, the Bureau must plausibly plead each of the following elements: "1) a payment or a thing of value; 2) made pursuant to an agreement to refer settlement business; and 3) an actual referral."  *Egerer v. Woodland Realty, Inc.,* 556 F.3d 415, 427 (6th Cir. 2009).  The Bureau has failed to do so here.

**1.  Preserving and Protecting the Client's Chosen Lender Was Not a "Referral" to Rocket Mortgage.**

As shown above, RESPA is designed to protect consumer choice and preserve their role in selecting settlement services providers.  The preserve and protect policy did exactly that.  In its terms and conditions, Rocket Homes told brokers that "it is important to preserve and protect the relationship between the client and *their chosen*

*lender.*"  ECF No. 2, PageID.52 ¶ 41 (emphasis added).  There is an obvious rationale for such a policy:  Before a consumer can meaningfully search for a home, they must expend time and effort shopping for and selecting a lender to provide financing; their real estate broker should be willing to support that choice and be prepared to work with that lender – not steer the consumer to another lender to start the process over.  Consistent with those purposes, the preserve and protect policy prohibited "[p]urposefully steering a client" away from their chosen lender.  *Id.*[3]

The Bureau alleges that "real estate brokers and agents who received referrals from Rocket Homes made [] referrals to Rocket Mortgage . . . by implementing the preserve and protect requirement."  *Id.*, PageID.66 ¶ 89.  But there was no "referral" to Rocket Mortgage.  The client already had chosen their lender: as the Complaint acknowledges, the policy applied to "preserve and protect" the "client's *chosen* lender."  *Id.*, PageID.52 ¶ 41 (emphasis added).  Section 8(a) applies to protect consumers from kickbacks and hidden referral fees that impede consumer choice – it does not prohibit conduct that occurs after the consumer has already made their choice.[4]

---

[3] The Bureau's effort to muddy the water by saying that those consumers "hadn't yet been *preapproved* by Rocket Mortgage" does not change the reality that in these circumstances Rocket Mortgage was, at the time of the so-called "referral," already the client's chosen lender.  *Id.*, PageID.55 ¶ 50 (emphasis added).

[4] The Bureau attempts to suggest that the "preserve and protect" policy was specific to Rocket Mortgage by highlighting references in it (as it existed six years ago) to "Quicken Loans" (n/k/a Rocket Mortgage).  These references simply reflected the

This common sense conclusion is reinforced by the original public meaning of the term "referral," which RESPA does not define. *See Keen v. Helson*, 930 F.3d 799, 802-03 (6th Cir. 2019) (using contemporaneous dictionaries to interpret a term RESPA did not define). Around the time Section 8(a) was enacted, to "refer" was understood to mean "to send or direct for treatment, aid, information, [or] decision" or "to hand over for consideration." Ex. 6, 2 WEBSTER'S THIRD NEW INTERNA-TIONAL DICTIONARY 907 (Phillip Babcock Gove & Merriam Webster Editorial Staff eds. 1981); Ex. 7, CHAMBERS TWENTIETH CENTURY DICTIONARY 1134 (A. M. Mac-donald ed. New Ed. 1972). It is impossible, however, to "send" or "direct" a person to a place they already are, or to "hand over" a person to someone they are already working with. The Bureau's construction of RESPA is nonsensical.

The Bureau attempts to circumvent the statute's text by suggesting that Section 8(a) is a broad anti-"steering" prohibition. *See* ECF No. 2, PageID.39-40 ¶¶ 4-5, PageID.53-54 ¶¶ 43-46, PageID.55 ¶¶ 49-51. But Section 8(a) says nothing about "steering." It prohibits only giving or receiving a "thing of value" pursuant to an agreement that a "referral," specifically, would be made to a person.

---

reality that, in 2019, nearly all of Rocket Homes' clients had applied for financing with Rocket Mortgage before asking to be connected to Rocket Homes to help with their home search. *See* ECF No. 2, PageID.49 ¶ 33, PageID.50-51 ¶ 38. Indeed, the Complaint acknowledges that Rocket Homes later struck all references to preserving and protecting the client's relationship with "Rocket Mortgage" from the terms and conditions (*id.*, PageID.53-54 ¶¶ 46-47) when this was no longer the case.

-12-

The Bureau's reliance on the definition of "referral" in Regulation X, which is the Bureau's implementation of RESPA, supports no other result.  ECF No. 2, PageID.64-65 ¶ 86.  Regulation X defines "referral" to mean "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service."   12 C.F.R. § 1024.14(f)(1).  However, even if the term "referral" as used in RESPA were ambiguous (and it is not), Regulation X does not provide the best interpretation of the term, and so is not binding here.  *See Loper Bright Enters v. Raimondo*, 603 U.S. 369, 394, 400-401 (2024).  The definition sweeps far too broadly, potentially covering even conduct widespread in the industry, such as targeted advertising, and imposes a neutrality standard on interactions with consumers that finds no grounding in the statute itself.  It makes no distinction between "influence" that is *de minimis* versus influence that ultimately drives the consumer's selection of a settlement services provider.  And by focusing on the "effect" on the consumer and whether they were "influence[d]," rather than the actions taken, it sows considerable doubt in application – particularly problematic for a statute that has both civil and criminal penalties. *See Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 730 (6th Cir. 2013) (Sutton, J., concurring) (explaining, in the context of RESPA, why "a court should not defer to an agency's anti-defendant interpretation of a law backed by criminal penalties").

Even if resort to Regulation X were appropriate here, however, the Bureau has not plausibly pled that the preserve and protect policy meets its definition of "referral."  First, the Bureau has not alleged that the policy required brokerages to take any "oral or written action" toward a consumer.  Rather, the Bureau's theory is that the policy caused brokers "to *refrain* from" taking oral or written action, namely, "mentioning the value of comparison shopping . . . or discussing various programs."  ECF No. 2, PageID.40 ¶ 4 (emphasis added).  The Bureau blithely asserts that brokers "actively steered their clients away from comparison shopping," but even if RESPA did prohibit "steering" this assertion is devoid of factual enhancement.

Second, the Bureau has not plausibly alleged that preserve and protect had the "effect of affirmatively influencing" the consumer.  12 C.F.R. § 1024.14(f)(1).  The policy was an agreement by the broker *not* to affirmatively influence the consumer's prior selection of a mortgage lender – the exact opposite of what Section 8(a) proscribes.  The Bureau does assert that "many Rocket Homes-referred consumers who came from other channels . . . had no connection with Rocket Mortgage."  ECF No. 2, PageID.51 ¶ 39.  But the Complaint makes no plausible allegation that the "preserve and protect" policy required partner brokerages to steer these consumers to Rocket Mortgage.  In the absence of a preexisting lender relationship with Rocket Mortgage, there was nothing to "preserve" or "protect."

Finally, the Bureau has not plausibly alleged that a broker's agreement to preserve and protect the client's chosen lender affirmatively influenced "the selection" of a mortgage lender where, as here, the consumer already had a "preexisting relationship" with that lender.  ECF No. 2, PageID.54 ¶ 48, PageID.64 ¶ 86.  Though the Bureau alleges that consumers could, and some did, change their selection of lender later in the process (*id.*, PageID.54 ¶ 48), that does not negate the client's choice.  It does, however, negate any plausible inference that consumers were somehow prevented from choosing a different lender.

The Bureau's theory of RESPA liability here is also entirely unworkable.  It would mean that any broker that refrains from interfering with the client's chosen lender – undoubtedly the case in most real estate transactions – would be affirmatively influencing the client's selection of lender by making it more likely that the client will "select" (*i.e.*, remain and close with) that lender rather than go elsewhere.  This construction of RESPA would come as quite a shock to the real estate industry.

### 2. The Bureau Fails to Plausibly Allege That Partner Brokerages Received A "Thing of Value" From Rocket Homes in Exchange <u>For Any "Referral" to Rocket Mortgage.</u>

Section 8(a) prohibits referrals only if made in return for a "fee, kickback, or thing of value."  12 U.S.C. § 2607(a).  Here, the "thing of value" identified in the Complaint is the "ability" to receive future real estate referrals from Rocket Homes.

*See* ECF No. 2, PageID.41 ¶ 10.  But the possibility of future referrals is far too remote and speculative to constitute a "thing of value" under the statute.

RESPA defines a "thing of value" as "any payment, advance, funds, loan, service, or other consideration."  12 U.S.C. § 2602(2).  The catch-all "other consideration" is "construed to embrace only objects similar in nature to those objects enumerated by [its] preceding specific words."  *Tiger Lily, LLC v. United States Dep't of Hous. & Urb. Dev.*, 992 F.3d 518, 522 (6th Cir. 2021) (applying cannon of *ejusdem generis*).  Though these terms go beyond direct monetary compensation (*e.g.*, "service[s]"), what they have in common is that each has a tangible monetary "value."  This interpretation aligns with the underlying purpose of RESPA, which is to prohibit "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services."  12 U.S.C. § 2601(b).

Here, however, the Bureau alleges that Rocket Homes gave partner brokers something that was qualitatively different than the types of concrete categories of consideration enumerated in the statute.  The Complaint alleges that Rocket Homes gave partner brokers the "ability to continue receiving referrals" from Rocket Homes in exchange for home-grown referrals.  ECF No. 2, PageID.66 ¶ 90; *see also id.*, PageID.41 ¶ 10 (describing the "thing of value" as "[t]he ability to receive future referrals").  In other words, the Complaint alleges that brokerages maintained their eligibility for receiving referrals – alongside 20,000+ other brokers and agents – *not*

that they received additional referrals.  The theoretical possibility that a brokerage may receive a future referral is simply too abstract to have any monetary "value," and is therefore not a "thing of value" for purposes of RESPA.  *See Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 663 (8th Cir. 2012) (observing that "the possibility" of a benefit is not a "thing of value" for purposes of RESPA); *CFPB v. Borders & Borders, PLC*, 2018 WL 1440606, at *3 (W.D. Ky. Mar. 22, 2018) (holding that a "*potential* benefit is insufficient to constitute a 'thing of value'").

Instead of relying on the statute, the Bureau looks to Regulation X's definition of "thing of value," which includes "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d); ECF No. 2, PageID.41 ¶ 10.  But the original version of Regulation X contemporaneous with RESPA's enactment did not define "thing of value" to include "the opportunity to participate in a money-making program."  Instead, it included only things with a tangible monetary value:  "monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, credits representing monies that may be paid at a future date, special bank deposits or accounts, banking terms, special loan or loan guarantee terms, services of all types at special or free rates, and sales or rentals at special prices or rates."  Ex. 8, 24 C.F.R. § 3500.14(b) at 22707 (June 4, 1976).  Thus, the current definition of "thing of value" in Regulation X is neither a persuasive interpretation, nor is it entitled to deference or respect. *Loper Bright*,

603 U.S. at 370 (respect "warranted when . . . interpretation was issued roughly con-

temporaneously with enactment of the statute and remained consistent over time").

### C. The Bureau Has Not Plausibly Alleged a Reciprocal Referral Ar-rangement Between Rocket Homes and Its Partner Brokerages.

The Bureau contends that Rocket Homes also violated Section 8(a) by provid-

ing its broker partners with "additional referrals" in exchange for their referrals of

"home-grown" clients to Rocket Mortgage for financing and Amrock for title, clos-

ing, and escrow services.  ECF No. 2, PageID.40-42 ¶¶ 7-10, PageID.57-61 ¶¶ 60-

75.  A claim for liability under Section 8(a), however, requires more than showing

that two parties have made referrals to each other or each other's affiliates.  To prove

a violation, the Bureau must show, *inter alia*, that Rocket Homes made real estate

referrals "pursuant to an agreement or understanding" that the partner brokerage

would make referrals to Rocket Mortgage and/or Amrock in return.  12 U.S.C. §

2607(a).[5]  No such agreement or understanding has been plausibly alleged here.

#### 1. The Complaint Does Not Plausibly Allege an "Agreement or Un-derstanding" Between Rocket Homes and the Mitchell Group to Reciprocate Referrals.

Out of the thousands of brokers in the partner network, the Complaint identi-

fies only one specific family of brokerages – the Mitchell Group – with whom it

---

[5] If this case is not dismissed, Rocket Homes will demonstrate through discovery that "additional referrals" and/or "prioritized referral flow" are not "things of value" for purposes of RESPA.

-18-

believes Rocket Homes had an agreement or understanding to reciprocate referrals. Much of the emphasis in the Complaint is placed on emails from Jason Mitchell himself touting the business the Mitchell Group did with Rocket Mortgage and Amrock, and asking for more referrals from Rocket Homes.  Specifically, the Bureau alleges that Mr. Mitchell "sometimes forward[ed] . . . emails to Rocket Homes to ensure they knew his agents were funneling business to Rocket Homes' sibling companies" (ECF No. 2, PageID.60 ¶ 70), and "[o]n several occasions," including in an email from May 16, 2019, "[he] explicitly tied [his] requests for additional referral flow to the brokerage giving Amrock and Rocket Mortgage . . . referrals." (*id.*).

Consistent with basic contract principles, to establish an "agreement or understanding," RESPA "has always required two culpable parties for a violation." *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 636 n.9 (2012).[6]  In other words, for a violation of RESPA to arise, both parties must have agreed, or had the same understanding, that referrals would be reciprocated.  Mr. Mitchell's repeated requests for more referrals – and even the (alleged) fact that he "expected priority for referral flow from Rocket Homes" (ECF No. 2, PageID.60 ¶ 71) – says nothing about whether Rocket Homes agreed to make referrals to the Mitchell Group in return.  *See Stith v. Thorne*, 488 F. Supp. 2d 534, 556-57 (E.D. Va. 2007) (citations omitted)

---

[6] *See, e.g.*, *Kolpacke v. Moore Sales Corp.*, 2013 WL 6511862 at *9 (E.D. Mich. Dec. 12, 2013) ("[T]o establish a contract exists, there must have been a 'meeting of the minds' or mutual assent to all material facts") (internal citations omitted).

-19-

(Section 8(a) liability exists only where both "the payor and the recipient of the thing of value understand that the payment is in return for the referral of business").  Here, the Complaint does not allege a single statement from Rocket Homes to Mr. Mitchell (or anyone else) in any form that could even conceivably be construed as supporting the existence of an agreement or understanding to reciprocate referrals.

The Complaint also does not allege facts from which an understanding to reciprocate referrals could plausibly be inferred from the parties' course of conduct. The Complaint alleges two specific instances where Mr. Mitchell asked for additional referrals from Rocket Homes and received them.  ECF No. 2, PageID.61 ¶¶ 72-73.  But it does *not* allege that Mr. Mitchell said anything about the referrals the Mitchell Group made to Rocket Mortgage or Amrock in connection with either request.  Nor is there a plausible temporal connection: these requests came some ten and twenty-two months, respectively, after Mr. Mitchell emailed Rocket Homes referencing an "exchange of business."  *Id.*, PageID.60-61 ¶¶ 71-73.[7]  And, despite the countless emails, documents, and testimony the Bureau obtained from Rocket Homes and the Mitchell Group during its investigations, there are no factual allegations in the Complaint about any connection between Rocket Homes' referrals to the Mitchell Group, on the one hand, and the "the volume or value" of the Mitchell

---

[7] The Bureau added the words "reciprocal referrals" in brackets, but those words appear nowhere in the email.  ECF No. 2, PageID.60 ¶ 71.

Group's referrals to Rocket Mortgage or Amrock, on the other. *See* 12 C.F.R. § 1024.14(b) (describing an "agreement or understanding"); *see also Krupa v. Landsafe, Inc.*, 514 F.3d 1153, 1156 (11th Cir. 2008) ("In order for there to have been a forbidden kickback, there would have to have been an agreement between the two that Countrywide would give Landsafe *more* of its credit reporting business than it was giving Landsafe before the agreement . . . .") (emphasis added). The two alleged anecdotes merely show that the Mitchell Group "*continued* to receive referrals from Rocket Homes." ECF No. 2, PageID.61 ¶ 74 (emphasis added). That does not establish a plausible agreement or understanding to reciprocate referrals based on specific improper conduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (although parties' "parallel conduct was consistent with an unlawful agreement, . . . it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed more likely explained by, lawful, unchoreographed free-market behavior").

The Complaint also alleges that on "several" occasions either Rocket Homes or Rocket Mortgage selected the Mitchell Group to participate in so-called "experimental pilot programs" that resulted in "additional referral flow that wasn't available to the vast majority of real estate brokerages." ECF No. 2, PageID.61 ¶ 75. This, too, fails to plausibly plead an agreement or understanding to reciprocate referrals. The Complaint acknowledges that other brokerages were also selected to participate in pilot programs (*id.*), and nowhere does the Bureau allege, even in conclusory

form, that the Mitchell Group was selected to participate because it made referrals to Rocket Mortgage and Amrock.  *See Taylor v. Gorilla Capital, Inc.*, 2018 WL 3186946, at *6 (D. Or. June 28, 2018) ("Simply doing 'a substantial amount of business' with a certain escrow company does not result in a violation of § 2607.").  The Complaint falls far short of plausibly pleading the requisite agreement or understanding to exchange referrals with the Mitchell Group.

### 2. The Complaint Does Not Plausibly Allege an "Agreement or Understanding" Between Rocket Homes and Any Other Brokerage Partner to Reciprocate Referrals.

The Bureau appears to contend that Rocket Homes had reciprocal referral agreements with all of its broker partners although the Complaint mentions no other partner brokerage by name.  *See* ECF No. 2, PageID.57-59 ¶¶ 60-68.  To state a Section 8(a) claim, however, a plaintiff must allege "specifics as to the date, time, or amount of the alleged § 8(a) violations," *Galiano v. Fid. Nat. Title Ins. Co.*, 684 F.3d 309, 315 (2d Cir. 2012), which the Complaint here fails to do.  It baldly alleges that Rocket Homes "cut referral flow for those" brokerages who did not refer their home-grown clients to Rocket Mortgage.  ECF No. 2, PageID.58 ¶ 64.  But it does not identify a single brokerage that had its referral flow "cut," or any facts connecting a purported reduction in referral volume to a failure to reciprocate referrals.  The Bureau's reciprocal referral theory should be dismissed for this reason alone.

Beyond that, the facts that are alleged do not state a cognizable Section 8(a) claim.  The Complaint does not allege that any unnamed brokerage reasonably believed that referring their home-grown clients to Rocket Mortgage or Amrock would result in more referrals from Rocket Homes, or that any unnamed brokerage actually received additional referrals for that reason.  *Stith*, 488 F. Supp. 2d at 556-57 (no "agreement or understanding" without evidence the parties knew that kickbacks were being provided for referrals).  The Complaint does allege that Rocket Homes called Amrock its "preferred provider" for title and settlement services.  ECF No. 2, PageID.58-59 ¶¶ 66-68.  But describing Amrock as a "preferred provider" does not plausibly establish an "agreement or understanding" to reciprocate referrals.  *Cf. id.*, PageID.41 ¶ 10.  The Complaint also alleges that Rocket Homes "made site visits to various real estate brokerages, along with representatives from Rocket Mortgage and Amrock."  *Id.*, PageID.57 ¶ 60.  But joint promotional activities are not prohibited by RESPA.[8]  Though the Bureau says that site visits included an "implied" "message" that referrals would be reciprocated, the Complaint does not reference a single statement made by anyone during any site visit that would render this conclusory assertion plausible.  *Id.*, PageID.58 ¶ 61.  Finally, the Complaint says that Rocket

---

[8] *See, e.g.*, Ex. 9, *RESPA FAQs*, CFPB, (October 7, 2020) (discussing permissibility of "normal promotional" activities directed to a referral source); Ex. 10, *RESPA FAQs*, NAR (Q: "Is it legal for settlement providers to put on education courses about the services the affiliate member provides to real estate professionals?" A: "Yes, . . .").

Homes would "sometimes call real estate brokerages and directly challenge them to make a referral to Rocket Mortgage." *Id.*, PageID.58 ¶ 62.  While no specific facts are alleged, even taken at face value, simply *requesting* a referral does not plausibly plead an agreement to reciprocate referrals.  In fact, it suggests the opposite.

### D. The Bureau's Lawsuit Should Be Dismissed Because It Was Filed and Is Being Prosecuted Using Unlawfully Obtained Funds.

The Court should dismiss this case with prejudice because it is being litigated with funds transferred to the Bureau in violation of statutory restrictions on its funding.  The Bureau funds its operations by requesting funding from the Federal Reserve.  12 U.S.C. § 5497(a)(1)-(2).  Those funds may come only "from the *combined earnings* of the Federal Reserve System." *Id*. § 5497(a)(1) (emphasis added).

The "earnings" of the Federal Reserve System are its net earnings – *i.e.*, revenues in excess of expenditures and other losses.  The Supreme Court recognized as much in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024).  It held that the Bureau's funding derives from the "*surplus funds* in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *Id*. (emphasis added).  The Federal Reserve's "surplus fund[s]" are its "*net* earnings." 12 U.S.C. § 289(a)(2) (emphasis added).  The plain meaning of "earnings" confirms this interpretation.  *See, e.g.*, Ex. 11, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 391 (11th ed. 2007) (defining "earnings" as "the balance of revenue after deduction of costs and expenses").

Since September 2022, however, the Federal Reserve has had no earnings to transfer to the Bureau.[9]  Yet, despite having no earnings, the Federal Reserve has continued to transfer funds to the Bureau, including $729.4 million dollars in 2024. *See* Ex. 13, KARL E. SCHNEIDER ET AL., CONG. RSCH. SERV., THE CONSUMER FINANCIAL PROTECTION BUREAU BUDGET, at 6 (2024).  These transfers are the principal means by which the Bureau is funded.[10]  The Court should not permit the Bureau to flout its enabling statute by using unlawfully requisitioned funds to prosecute this enforcement action.  Instead, the Court should dismiss this lawsuit with prejudice.

## IV.   CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: February 21, 2025                         Respectfully submitted,

/s/ Jason R. Hirsch                              Levi W. Swank
Jason R. Hirsch (P58034)                         W. Kyle Tayman
Jeffrey B. Morganroth                            GOODWIN PROCTER LLP
MORGANROTH &                                     1900 N Street, N.W.
MORGANROTH, PLLC                                 Washington, DC 20036
344 North Old Woodward Avenue                    Tel.: (202) 346-4000
Suite 200                                        Fax: (202) 346-4444
Birmingham, MI 48009                             LSwank@goodwinlaw.com
Tel.: (248) 864-4000
Fax: (248) 864-4001                              *Attorneys for Rocket Homes Real*
jhirsch@morganrothlaw.com                        *Estate LLC*

---

[9] Ex. 12, *Fed. Reserve Balance Sheet Dev., December 2024*,  BD. GOVS. FED. RESERVE (Dec. 6, 2024).  The Court may take judicial notice of official government publications available on an agency's website.  *See Aslam v. United States Dep't of State*, 2023 WL 6163969, at *9 & n.115 (D. Utah Sept. 21, 2023).

[10] Ex. 14, *CFO update through fiscal year 2024*, CFPB (Jan. 3, 2025).

## LOCAL RULE CERTIFICATIONS

I, Jason R. Hirsch, certify that the foregoing complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts).


*/s/ Jason R. Hirsch*
Jason R. Hirsch

-26-

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Michigan by using the CM/ECF system on **February 21, 2025**.  I further certify that all participants in the case are registered CM/ ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on **February 21, 2025**.


*/s/ Jason R. Hirsch*
Jason R. Hirsch

-27-